# JANUARY TERM, 1872, AT LANSING.

## Elizabeth F. Denison v. Chauncey W. Gibson and others.

*Illegal contract: Surety: Relief in equity.* A surety for the purchase price of the stock of a national bank is entitled in equity to a release from all liability where material parts of the arrangement for the sale and purchase of the stock as made and carried out, without the knowledge of the surety, were illegal and opposed to public policy, a violation, in several particulars, of the currency act, and a fraud upon the bank, in so much as to seriously affect the value of the subject of the purchase and thereby lessen the ability of the principals to pay. The agreement of the surety is not binding where the bargain between the primary parties, out of which it springs, is contaminated by positive illegalities.

*Equity: Surety: Principal.* The equity of such a surety does not depend at all upon the right of the principals to demand the like relief. And whether or not they had put themselves in a position, where they could not recede or compel a revocation it would not affect the rights of the surety.

*Surety: Principal: Husband and wife.* The right to such relief is not subverted or impaired by the circumstance that the surety is wife of one of the principals, who, in consequence of that relation, may reap some benefit from it. Her rights are no less than they would be if a separation had been caused by divorce or death.

*Bill in equity.* Where a bill in equity, for the discharge of a surety, on the ground that the principal obligation is illegal and contrary to public policy, sets out specifically the contract made and what was done under it, from which it sufficiently appears that the original contract was open to the objections named, the objection to the bill that it does not specifically charge that the contract was illegal will not be sustained.

*Heard October 5, 6, 7 and 10.  Decided January 4.*

Appeal in Chancery from Bay Circuit.

This bill was filed by Elizabeth F. Denison, against Chauncey W. Gibson, Sanford M. Green, William C. Green and Elias B. Denison, complainant's husband, to set aside and cancel a mortgage given by her, on her separate property, to secure the payment of several notes which she had signed as surety with the defendants, Green and Denison,

and which were given by the latter to defendant Gibson for part of the purchase-price of stock of the First National Bank of Bay City, and also to cancel her contract relation on said notes. No defense was made except by defendant Gibson. The case was heard on pleadings and proofs, and the court below granted the relief prayed. The defendant Gibson appealed to this court.

*Marston & Hatch, John Moore, William L. Webber* and *Ashley Pond,* for complainant.

*McDonell & Cobb, C. I. Walker* and *George V. N. Lothrop,* for defendant Gibson.

GRAVES, J.

The matters in this large record are so numerous, some are so blind, and many are so intricate and extensive, that any attempt to trace them through all their changes and windings, and explain their connections and bearings, would require a volume.

It so happens, however, that there is no need for any thing so elaborate, because the case is ripe for decision on a ground which will be sufficiently elucidated by attending to a few of the leading features of the case. In the early part of 1863, the defendant Gibson and his father, Charles D. W. Gibson, with a capital of four thousand dollars, commenced the business of private banking at Bay City, which was continued with seeming success until the following winter, when the same parties, with some others, organized under the national currency act of February, 1863, "The First National Bank of Bay City" with a capital stock of fifty thousand dollars, and which, according to the claim of defendant Gibson, was afterwards, and in the summer of 1865, increased to one hundred thousand dollars.

On the first organization, the defendant Gibson held twelve thousand seven hundred dollars, and his father twelve thousand eight hundred dollars, of the stock, and the residue was held by four others.

When the alleged increase was made in 1865, the defendant Gibson took thereof thirty-nine thousand dollars, his father nine thousand dollars, his brother, T. W. Gibson, one thousand dollars, and H. J. Clark, the cashier, one thousand dollars. From the first organization to the transfer in July, 1867, the defendant Gibson continued to be a heavy stockholder, and likewise the president and chief financial manager of the bank, and during the same period, and until long after the transfer, if not until the suspension at the end of 1867, he held the office of director.

At the time of the sale to his co-defendants, in July, 1867, he states that the stock which was embraced in the sale, and which he was authorized to sell, was owned as follows: He held forty-nine thousand dollars; his wife, ten thousand dollars; his father, thirty thousand dollars; his brother, T. W. Gibson, three thousand dollars; his brother, Charles F. Gibson, one thousand dollars; and Harvey J. Clark, the cashier, two thousand dollars.

According to the evidence, the bank appeared to the general public to have done a profitable business, and to be in a sound and satisfactory condition. The complainant was the daughter of James Frazer, a man of wealth at Bay City. She intermarried with defendant Denison in 1864, and he was neither at that time or afterwards possessed of much property. In the fall of 1866, William C. Green, one of the defendants, and one John Johnston commenced the business of private banking at Bay City, under the style of W. C. Green & Co. In the winter following, the father of William C. Green also became a

member of this firm, and about the 18th day of June, 1867, the defendant Denison, succeeded Johnston.

The defendant William C. Green was a young man without much, if any, means. His father was wholly unacquainted with banking, and had been influenced to enter the firm chiefly by his desire to advance the interests of his son. He intermeddled very little with the business, and was extremely uninformed about it. The responsibility of the firm was at all times inconsiderable. As it now appears, both Denison and William C. Green were quite inexpert in banking, and plunged into outside speculations very unprofitable to themselves, and detrimental to their bank. At the time of the trade in July, 1867, their firm was in a precarious condition, and nearly, if not quite, insolvent.

While, as already intimated, the institution over which Gibson presided, and in the management of which he exercised nearly absolute control, seemed to the public to be conducted wisely, and with success, the real circumstances were very different.

We cannot read the record without seeing that Gibson, notwithstanding his position of authority, trust and responsibility, made the true interest of the bank, from first to last, subservient to his private gain and advantage; that he assiduously employed himself in private and personal operations for his own emolument, and usually cast the risks upon the bank, and decoyed whatever there was of profit into his private coffers. The varied, circuitous and blind expedients devised for the execution of this policy, reveal themselves with more or less fullness and distinctness in the proofs, and need not be pointed out or described here.

The books and accounts of the bank, instead of being

so kept as to present a plain and truthful record of its business and condition, were disfigured and darkened by errors, mysteries and ambiguities. Even the learning and ingenuity of the bar were inadequate to thread the labyrinth. Enough, however, is developed to show that the bank, when the negotiations for the sale commenced, and ended, was loaded by defendant Gibson with more than fifty thousand dollars of unbankable assets, consisting of uncollectable demands, irregular and long-time paper, and corporation stocks of fluctuating and uncertain value.

These vices and irregularities in the management necessarily produced much disorder in the affairs of the bank, and certainly deserved to bring upon it the correcting hand of the government. And there is much reason for believing that even the fertility of defendant Gibson, in the subtleties of irregular banking, would have failed in averting much longer the intervention of the comptroller of the currency by legal measures under the law of congress.

Bearing in mind the circumstances which have been mentioned, and their order of time, it is next to be observed that complainant's father having died in 1866, his large estate was finally settled and distributed about the first of June, 1867, of which defendant Gibson was aware, and that the portion which fell to complainant was of great value, and consisted principally of real estate, of which the parcels mentioned in the bill, and mortgaged to defendant Gibson, are part. For some two years before Mr. Frazer's death his real and a portion of his personal estate had been managed by one Bernard Witthauer, and after the division of the estate this gentleman had been employed somewhat in looking after the interests of complainant. About the 20th of June, 1867, and within two or three weeks after complainant had received her portion of the estate, and two or three

days after her husband had entered the firm of W. C. Green & Co., Mr. Witthauer, understanding that defendant Gibson wished to sell his real estate, asked to be employed to negotiate a sale. But Gibson informed him that he desired to sell all his property including the bank, and in reply to Witthauer's remark that it would be difficult to find a purchaser for so large a property, instructed him to apply to W. C. Green & Co., and furnished him with a document said to contain a description of the property and its value. This paper appears in the record as exhibit "A."

With this information and direction, and under these circumstances, Mr. Witthauer initiated negotiations with W. C. Green & Co., which were soon participated in, and at length consummated, by Gibson in person. The negotiations were in progress for several days, and ended in a bargain about the 6th or 7th of July, 1867, and some material parts of the final arrangement appear to have been adopted step by step, as they were carried out. The subject matter of the sale by Gibson consisted of certain real estate and other property, and ninety-five thousand dollars of the stock of the bank set down at one hundred and twenty-three thousand five hundred dollars, and the whole purchase-price, of which part was to be paid in hand and part secured on time, was fixed at one hundred and sixty-two thousand six hundred and six dollars and twenty-one cents. At this time W. C. Green & Co. had a little over nine hundred dollars in cash, and something more that sixty thousand dollars of all grades of discounted paper, and on much of which members of the firm were in some form directly liable. Besides the liability on this paper, and in other forms, and besides the liabilities of individual members, the firm were also liable to depositors in nearly forty thousand dollars. They had no credits at Gibson's bank. And in this state of affairs, and as part and parcel of the bargain,

the following plan was contrived and carried out for paying and securing the purchase price:

The sum of sixty-one thousand one hundred and sixty-six dollars and fifty-four cents was to be paid in hand, and pursuant to the agreement it was paid in this way: The defendant Gibson, acting for the bank he was in effect selling, re-discounted thereat between forty-three thousand dollars and forty-four thousand dollars of the discounted paper, held by W. C. Green & Co., as the basis of a credit in their favor, gave them credit for the sum indicated by the re-discount, and then took their check on the bank for the whole sixty-one thousand one hundred and sixty-six dollars and fifty-four cents, and immediately obtained certificates of deposit for fifty thousand dollars of that sum, in lieu of so much of the check, and at the same time received a credit on the books of the bank for the balance called for by the check. The further sum of five thousand four hundred and thirty-nine dollars and sixty-seven cents was paid by assignment to Gibson, of certain real-estate securities of complainant. The sum of twenty thousand dollars was secured to be paid by time notes on interest, made by the Greens and Denison, and the retention in Gibson's hands by way of pledge of two hundred shares of the bank stock sold to W. C. Green & Co. The balance, being seventy-six thousand dollars, was secured by a series of time notes carrying interest, executed by the Greens and Denison, and also by complainant, and these notes were further secured by complainant's mortgage.

It was also an integral part of this arrangement, that defendant Gibson should continue in the office of director, and that Harvey J. Clark should also continue to be director and cashier, although the latter would, as he did, cease to be a stockholder, and the former would, as he did,

24 MICH.—25.

cease to hold stock as absolute owner on completion of the sale.

It is quite unnecessary to notice all the details of this transaction, or to trace all the shifts and changes made afterwards. The inherent nature of the executed bargain was not alleviated. It does not appear, nor is there any reason to suppose, that complainant was aware of the intrinsic nature of the expedient for paying the sixty-one thousand one hundred and sixty-six dollars and fifty-four cents, or of any state of facts constituting illegality or fraud in any branch of the transaction.

Soon after the completion of the business the bank was in trouble, and indeed in a financial delirium, and a discreet and informed banker would have seen that its condition was critical if not desperate. But Denison, who seems to have been extremely credulous and amazingly wanting in the kind of knowledge essential to sound and successful banking, was still hopeful that the institution might be kept running, and exerted himself ineffectually to prop it up.

In December, or a little over five months after the purchase, he obtained from the Greens all their part of the stock, except two thousand five hundred dollars retained by one of them, and continued to make efforts in various directions to secure aid. As might have been anticipated his endeavors were fruitless, and finally and on the last day of December, 1867, and a little less than six months after the purchase, the bank became unable to meet its engagements and necessarily suspended payments.

Thereupon the stock and nearly all the property Denison held was passed over to other parties, who soon after reorganized the bank on a new footing. The defendant Gibson surrendered the two hundred shares which he had retained as security, and he appears to have acquiesced

in the transformation of the bank, which occurred after the suspension. Shortly after the failure, a large number of the creditors compromised for sixty cents on the dollar in stock and such assets as the bank held. Some realized the face of their demands, after considerable delay, by appreciation of property in which they were paid.

On the 10th of January, 1868, the complainant filed this bill to set aside and cancel the before mentioned mortgage and her contract relation on the several notes she had signed. No defense was interposed except by the defendant Gibson, and the court below having granted the relief prayed, he appealed to this court.

The complainant founds her equity upon two grounds : *First*, That in obtaining her accession to the arrangement a private fraud was practiced upon her in respect to the actual circumstances and condition of the First National Bank of Bay City, and the real standing, resources and pecuniary ability of W. C. Green & Co.; and, *second*, that material parts of the arrangement for the disposition of the bank and its official agencies as made and carried out, were illegal, opposed to public policy, a fraud upon the bank and upon her. In the view taken in this opinion it is unnecessary to examine the first ground, because it is considered that the circumstances warrant the relief sought upon the second.

In the able arguments from the bar on the part of Gibson, it was not only conceded, but affirmed, that the position of complainant in the business was that of a mere surety for Denison and the Greens, and no one attempted to controvert the position that the plan contrived and executed to work a transfer of the bank stock and management, and to pay and secure Gibson, was a clear violation of the letter and spirit of the currency act, and of a nature to be detrimental to the standing and working ability

of the bank. But it was claimed, however, that the failure of the institution was caused by the embarrassments, want of means and bad management of W. C. Green & Co., and not by the antecedent condition of the bank, or the alleged improprieties connected with the sale; that the vices charged against that transaction were not available to complainant, because, as was said, her undertaking was so far separate and distinct that it was not infected by them; that the bill did not set forth a case which would justify relief on the ground of illegality, and that it would be inequitable to allow the surety to recede while the principals retained the benefits of the purchase.

In order to see the case more clearly in that aspect in which it is here considered, it seems expedient to take a closer view of the objectionable features of the arrangement, of which the agreement that complainant should become surety, was an element.

It is very clear that defendant Gibson remained president until the trade was finished and the operations concluded which made Denison and the Greens stockholders and qualified to be officers, and that he continued to be a director thereafter. Although the scheme of the defendants comprised several ingredients, it was after all, a single and determinate transaction.

Among its fundamental requisites, agreed upon and carried out, were these: The sale of ninety-five thousand dollars of the bank stock and a change of management; the continuance of Mr. Clark in the offices of director and cashier without his being the owner of any stock; the continuance of defendant Gibson in the office of director without his holding any stock except by way of pledge as security for part of the purchase price of the property sold by him; the creation of a debt from the bank to Gibson, its president, of more than thirty-nine thousand dollars,

through a discount by the bank under his management, of paper to that amount, which was held, indorsed and presented for discount, by W. C. Green & Co.; the creation of a further debt from the bank to Gibson, its president, of more than seventeen thousand dollars by means of a loan of that amount to W. C. Green & Co., over and above all their credits, and on no other security than their check.

As a part of the identical scheme containing these arrangements, and not only essential to it, but resting on it for consideration, were the engagements of complainant as surety.

To estimate these facts correctly, it is appropriate to refer to some of the provisions of the currency act of June 3, 1864. By the ninth section, it is required that each director shall own in his own right, at least ten shares of the capital stock, and the tenth section declares that any director, ceasing to be the owner of the requisite amount of stock, shall thereby vacate his place. The ninth section further provides, that each director shall take an oath that he is the *bona fide* owner in his own right of the number of shares required, and that it is not hypothecated, or in any way pledged as security, for any loan or debt, and that he will so far as the duty devolves on him, diligently and honestly administer the affairs of the association, and will not knowingly violate, or willingly permit to be violated, any of the provisions of the act. The fifty-third section declares that if the directors shall knowingly violate, or knowingly permit any of the officers, agents or servants of the association to violate, any of the provisions of the act, all the rights, privileges, and franchises of the association derived from the act, shall be forfeited, in case such violation is established in a suit by the comptroller of the currency in the proper federal court. The fifty-

fifth section makes it a misdemeanor in any president, director, cashier, teller, clerk or agent, to abstract or willfully misapply any of the money, funds or credits of the bank, or without authority of the directors to issue, or put forth any certificate of deposit, or make any acceptance, or to make any false entry in any book, report or statement of the association, with intent to injure, or *defraud the association,* or any company, body-politic *or any individual person.* The twenty-ninth section enacts " that the total liabilities to any association of any person, or of any company, corporation or firm, for money borrowed, including in the liabilities of a company or firm, the liabilities of the several members thereof, *shall at no time exceed one-tenth part of the amount of the capital stock of such association actually paid in :* Provided, that the discount of *bona fide* bills of exchange, drawn against *actually existing values,* and the discount of *commercial or business paper actually owned* by the person or persons, corporation or firm negotiating the same, shall not be considered as money borrowed."

The stipulations, which were carried out, for the continuance of Clark and Gibson as directors after the sale, are seen to be plain violations of the law. The former was not to own, and did not own, any stock, and the latter was not to hold any, and did not hold any, except by way of pledge as security. The plan adopted and executed to work out a payment to Gibson, through the discount by the bank of more than thirty-nine thousand dollars of the paper presented by W. C. Green & Co., was a violation of the law. That paper was not *bona fide* bills of exchange drawn against existing values, nor was it in any just sense commercial or business paper owned by W. C. Green & Co., nor was it understood to be. The transaction was not within the proviso of the twenty-ninth section. But it was in substance

and effect a mere colorable operation designed to make Gibson a creditor of the bank through a delusive discount thereat to W. C. Green & Co., and was in contravention of the real meaning and intent of the body of that section. The credit to Gibson at the bank for more than seventeen thousand dollars upon the bare check of W. C. Green & Co., when the law expressly forbade the creation of any such liability for more than ten thousand dollars at the outside, requires no comment.

When we observe the positions of the parties and the related circumstances, it is impossible to regard the illegalities which occurred as mere irregularities connected with the purchase of the bank and not the subject of complaint by Mrs. Denison. She has peculiar claims upon the wakeful solicitude of a court of equity. She is a married woman seeking to preserve her separate estate from the wrongs and folly of others. She is a surety and asks to be relieved from her engagements as such, in a case where they were made to enable her promisee to sell and her principals to purchase a banking institution, and where upon the sale the promisee and her principals, without her knowledge, united in illegal arrangements which reached forward and contributed to deprive it of all strength and vigor in the hands of her principals, to make it nearly if not quite barren as a means to assist in paying the debt, and to render it subject to be deprived of its franchises at the instance of the official agency at Washington. The subject and object of the treaty, and her situation and the nature of her undertaking, with its liabilities, rights and incidents, closely connected her in the relation she assumed, with the body of the arrangement, and especially with that part of the plan which turned the mode of payment by her principals into a vital disparagement of the subject they were buying. Being a mere surety in regard to the purchase

she was entitled to look to the bank to be acquired, and the benefits and advantages it could yield in the state in which it was before the trade, as constituting something which, in the hands of her principals, could be subjected and made subservient to her interests, and definitely conducive to her protection. And being aware that all the defendants had knowledge that Denison and the Greens would not have ability to pay except as made able through the worth and productive capacity of the property in treaty, she had the right to imply that Gibson as seller, and her principals as buyers, were not involving her as surety to complete and carry out an agreement containing conditions which were not only illegal, but by their very nature such as must conduce to despoil the bank of its apparent and special value, seriously impair its earning capacity and endanger its existence.

That the objectionable proceedings which have been named, crippled and debased the bank, that they exposed it to a forfeiture of its franchises, and much contributed to the final catastrophe which happened in little less than six months after the sale, cannot be doubted, and in my judgment, they afforded the complainant proper ground for relief. Indeed, it may be deduced from settled principles in this country and in England, in accordance with what is distinctly affirmed in the civil law, that the agreement of the surety is not binding where the bargain between the primary parties out of which it springs is contaminated by *positive illegalities.* Domat says: "If in the principal obligation there is any essential vice which may annul it, as if * * * it is contrary to law, the obligation of the surety is likewise annulled. For no one can take surety for validating engagements that are vicious in themselves." (*Article 1.*) And again—"Where the (primary) obligation has for its cause some commerce or some *disposition prohibited by*

*law,* the obligation of the surety will be without effect as well as that of the principal debtor."—*Art. 4, Pt. 1, B. 3, T. 4, Sec. 5, Cush'g Ed.* See also, *Swift v. Beers, 3 Denio, ·70 ; Dedham Bank v. Chickering, 4 Pick., 314, and cases ; Boston Hat Manufactory v. Messinger, 2 Pick., 223, and cases ; Levy v. Wise, 15 La. Ann. R. 38 ; Kimball v. Newell, 7 Hill, 116.* The instances in which the surety will be held, notwithstanding the bare invalidity of the principal undertaking, in consequence of the incapacity of the principal and the like, are noticed in Domat and also in *Kimball v. Newell.* But the rule governing these cases has of course no application here.

It is quite true that the principals of Mrs. Denison have not essayed to rescind the arrangement, and have not restored any thing to Gibson. But this circumstance can be of no avail against her. Whether her principals were, or believed they were, not in a position in which they could compel revocation, or whether they did or did not desire to recede, is not material. Her rights are not foreclosed by the passiveness of those who were parties to the illegalities. Having been induced to become surety in the purchase of a bank, when her principals and the seller, without her knowledge, adopted terms and conditions which were illegal, greatly injurious to the bank, prejudicial to her interests, and serving to impair her chance of protection and indemnification, she ought not, on applying for relief from her undertaking, to have the doors of the court closed against her upon the objection that the seller and her principals have allowed the matter to stand.

The defendant Gibson can no more rely upon this as an answer to her than a complainant, who seeks the aid of the court for the execution of a contract he has performed, can repel the defense of illegality asserted by his adversary, by insisting that the allowance of the defense

24 MICH.—26

will enable the defendant to retain the consideration. The court will not refuse to relieve the innocent surety because the creditor is unable to extricate himself from the consequences and entanglements of his illegal agreement, out of which the engagements of suretyship arose.

And complainant's equity is not subverted or impaired by the circumstance that one of the parties for whom she became surety was, and is, her husband, who may, in consequence of that relation, reap some benefit from her success. A mere moral incident of that kind, however likely to occur, can have no legal influence. Her rights are no less than they would be if a separation had been caused by divorce or death.

The rule in these cases for cancelation may be different where the ground of relief is a mere private fraud practiced upon the principal alone, and where no question of absolute illegality or of public policy is involved. But this is not such a case, and that point does not demand examination, and is not considered. Here we have positive illegality, a violation of public policy, and a fraud of a public nature, which was adapted to operate, and did operate, against complainant with all the severity and mischief of a direct and immediate fraud upon her. She seems to have been unaware of these objectionable doings, and was under no duty to watch for them. She was justified in assuming that the other parties were conforming to the law of the land, and were not impairing the property which formed the subject of the purchase, by illegal conditions in the bargain. A passage in Lord Hardwicke's judgment in *Chesterfield v. Janssen* is noteworthy in this connection. "Particular persons, in contracts, *shall not only transact bona fide between themselves, but shall not transact mala fide in respect of other persons who stand in such a relation to either as to be affected by the contract or the conse-*

*quences of it;* and as the rest of mankind *besides the parties contracting are concerned*, it is *properly* said to be *governed on public* utility."—*2 Ves. Sr., 125–156.* See also *Egerton v. Earl Brownlow, 4 House of Lords Cases, 140 to 152, 160 to 164, 173 to 177, 195 to 197, 238 to 246.*

The position that the bill is insufficient to permit relief on the ground mentioned, is not maintainable. The terms of the bargain, as settled and carried out, are quite fully given, and they show with reasonable clearness that the plan for paying the sixty-one thousand one hundred and sixty-six dollars and fifty-four cents, as fixed and executed, was not only illegal, but of a nature to cripple the bank and seriously impair its earning capacity and value; and the bill alleges that these proceedings were a fraud on the bank, and through their fraudulent effect upon that, were a fraud upon complainant. The case is before us on final hearing, upon pleadings and proofs, and it is neither urged, nor is there ground for urging, that any defendant has been misled. Without enlarging this opinion by· repeating what the bill contains, it is sufficient to observe that the allegations will justify the relief sought without departing from the course of the court, or even going so far as the authorities would allow.—*Hale v. Chandler, 3 Mich., 531; Tong v. Marvin, 15 Mich., 60; Attorney-General v. Corporation of Poole, 4 Myl. & C., 17–28; Williams v. Earl of Jersey, 1 Craig & P., 91; Smith v. Kay, 7 House of Lords Cases, 750.*

Whether in point of fact the defendants were at the time aware that their proceedings were illegal and fraudulent, is not a subject of inquiry, because, admitting they were not, the complainant's equity is just the same.

I think the decree of the circuit court, in consequence of the delay occasioned by the appeal, should be modified by a reasonable enlargement of the time prescribed for

delivering to the register the promissory notes mentioned, and that in all other respects it should be affirmed with costs against the defendant Gibson, and that the case should be remanded for the execution of the decree.

COOLEY, J.

We concur fully in the opinion just delivered. Besides the reasons there stated for the conclusions reached, there are also others which have influenced our minds in the same direction. We think it apparent from the evidence, that for a considerable period before the sale by defendant Gibson to W. C. Green & Co., the bank had been managed fraudulently, and in disregard of the provisions of the national currency act, with a design of deceiving the authorities, keeping up false appearances with the public, and at length transferring a shattered institution to a defrauded purchaser. We cannot put any other construction upon the acts of Gibson. His published statements upon which the government and the public were to rely, were systematically made deceptive; a considerable portion of the assets and discounts of the bank were not bankable, and were such as would not have been overlooked by the authorities had they not been deceived; he was in the practice of drawing fictitious drafts and making fictitious and blind entries with a view to giving the bank an apparent credit or available means which it did not possess in fact; and he caused the nominal capital of the bank to be increased fifty thousand dollars when nothing was in fact added to its means. All of these things were a fraud upon the law; all of them at last culminated in the sale to W. C. Green & Co., of a franchise which, but for the deception practiced upon the government, would long before have been taken away, and which was only disposed of through other violations of the law, so glaring and so injurious to the public

DENISON v. GIBSON.

as to constitute new and sufficient causes of forfeiture. The illegalities tended directly to defraud complainant, who had a right to rely upon the bank reports, and upon a compliance with the law which they apparently showed; and we agree with our brother Graves, that she has a right to be relieved, whether her principals demand the like relief, or are in position to demand it, or not. Though nominally a surety in the purchase, the patent fact is that from the time of the first suggestion in the mind of Gibson that this sale might be effected, it was the property of complainant he had in view, and if he contemplated fraud, as the evidence shows, she was the person to be defrauded rather than the nominal purchasers. Indeed, if he looked into the concerns of W. C. Green & Co. at all, or had knowledge of the manner in which their business was being transacted, he would not have been likely to rely upon them for the payment from their own means or probably future profits in the bank, of any considerable sum; and it is evident he did not. The fraud practiced upon the law and aimed at last directly at her property, the law should relieve her against; and if a loss results through illegalities in which she did not participate, the party guilty of them, and not she, must take the consequences.

CHRISTIANCY, CH. J., and CAMPBELL, J., concurred.