Henry v. Sneed.

## HENRY et al. v. SNEED et al., Appellants.

1. **Evidence: WITNESS: HUSBAND AND WIFE.** In a suit to enjoin the enforcement of a deed of trust securing upon the wife's land certain notes given by the husband in a transaction for the sale of property induced by fraud, the husband may testify as to conversations had with the fraud-feasors, and the husband and wife may testify as to conversations between themselves as to the transaction, as part of the *res gestœ*, and also on the ground of fraud, and this, *ex necessitate rei*.

2. ———: ———: ———. The party who uses the husband as a mere conduit to convey his fraudulent schemes to the ears of the wife of the latter will not be allowed, when the conversations thus induced between husband and wife are offered in evidence, in order more fully to unearth his fraud, to interpose the technical objection that, being conversations between husband and wife, they are, therefore, inadmissible.

3. **Pleading: AIDER BY ANSWER.** The answer, alleging the purchase of the notes by the defendant in good faith, supplies the omission of such averment in the petition to enjoin the sale of the security.

4. **Negotiable Notes: FRAUD: BONA FIDE HOLDER: BURDEN OF PROOF.** It being clear in such case that the notes had their origin in fraud, and the answer having alleged a purchase in good faith, the burden is on defendant who claims to own the notes to show a *bona fide* transfer before maturity, which is not met by evidence from which the date of the transfer does not appear except by inference.

| 99 | 407 |
|----|-----|
| 102 | 318 |
| 99 | 407 |
| 44a | 330 |
| 99 | 407 |
| 46a | 6 |
| 99 | 407 |
| 110 | 483 |
| 99 | 407 |
| 115 | 18 |
| 115 | 204 |
| 99 | 407 |
| 55a | 518 |
| 56a | 204 |
| 99 | 407 |
| 123 | 177 |
| 123 | 183 |
| 123 | 461 |
| 99 | 407 |
| 127 | 335 |
| 99 | 407 |
| 132 | 610 |
| 132 | 622 |
| 134 | 580 |
| 99 | 407 |
| 145 | 540 |
| 77a | 241 |
| 99 | 407 |
| f154 | 117 |
| 154 | 118 |
| 99 | 407 |
| 158 | 190 |
| 99 | 407 |
| 167 | 399 |
| 91a | 546 |
| 99 | 407 |
| 168 | ¹121 |
| 99 | 407 |
| 172 | ²293 |
| j97a | ³102 |

5. ———— : KNOWLEDGE OF FRAUD. Knowledge on the part of the agent of the purchaser of the note that "there was trouble about the trade" is sufficient to charge upon such purchaser notice of the fraud, and notice to the agent of the purchaser is notice to him.

6. ———— : KNOWLEDGE OF COMPROMISE : INNOCENT PURCHASER. Where the notes of the husband so procured through fraud are secured by a recorded deed of trust on the wife's land, knowledge by an indorsee that the husband had executed a compromise of his claim of fraud will not make the indorsee an innocent purchaser as to the wife.

7. ———— : HUSBAND AND·WIFE : ESTOPPEL. Though the wife on whose land the deed of trust is given is a surety for the husband, a compromise by the husband on account of the fraud through which the notes were procured will not estop her from setting up the fraud, especially where there is no evidence as to the nature of her estate in the land.

8. Husband and Wife : AGENCY. The relation of husband and wife creates no agency in the former to bind her by his representations as to land, not her separate estate.

9. Wife : SURETY : EQUITY. A wife as a surety may invoke equitable intervention in her behalf on the ground of fraud, although her principals are estopped to ask relief on their part.

*Appeal from Pettis Circuit Court.*—HON. J. M. STROTHER, Judge.

AFFIRMED.

*John Montgomery, Jr.,* for appellant, R. C. Sneed.

(1) The court erred in admitting the testimony of both Mr. and Mrs. Henry, the respondents, they being husband and wife, as to conversations had between themselves, or by them in connection with Shobe. *Holman v. Bachus,* 73 Mo. 50 ; *Moore v. Moore,* 51 Mo. 118 ; *Spradling v. Conway,* 51 Mo. 53 ; *Buck v. Ashbrook,* 51 Mo. 540; *Willis v. Tommell,* 67 Mo. 731; *Moore v. Wingate,* 53 Mo. 409 ; *Berlin v. Berlin,* 52 Mo. 152 ; *Miller v. Miller,* 14 Mo. App. 419 ; *Vogel v. Vogel,* 13 Mo. App. 588 ; *Cannon v. Moore,* 17 Mo. App. 99 ; *Waddle v. McWilliams,* 21 Mo. App. 298 ; *Hoffman v. Parry,* 23 Mo. App. 30. (2) Mrs. Henry, by the

execution of the deed of trust securing the notes of her husband, occupies simply the relation of surety for him. She being incompetent to contract, except by deed, can make no other contract than that shown by the deed, and the law will not give her any other or greater rights or privileges than it accords any other surety. Kelly on Contracts of Married Women, 191 ; 1 Jones on Mortgages, sec. 113 ; Brandt on Suretyship, sec. 22, and authorities cited ; *Wilcox v. Todd,* 64 Mo. 389 ; *Simons v. Kleeburg,* 56 Mo. 200 ; *Bank v. Burns,* 46 N. Y. 170; *Christian v. Brown,* 16 Iowa, 131 ; *Dennison v. Gibson,* 24 Mich. 199. The husband, the principal in the notes secured by the deed of trust of the wife, having compromised and adjusted all defenses which he had on the notes, cannot now question their validity. Story's Equity [11 Ed.] sec. 132. He cannot be heard to say the reaffirmance of the same false statements were a fraud which induced him to make the compromise, especially since he has stood upon it so long, and retained the property secured thereby. *Adams v. Sage,* 28 N. Y. 103 ; *Gould v. Bank,* 86 N. Y. 75 ; *Gifford v. Carvil,* 29 Cal. 592 ; Field on Damages, sec. 709 ; *Negley v. Lindsey,* 67 Pa. St. 217 ; *Lindsey v. Ferguson,* 49 N. Y. 625 ; *Campbell v. Moulton,* 30 Vt. 669 ; *Fitzpatrick v. Flanagan,* 16 Otto, 659. Nor can Mrs. Henry, who occupies through her property the relation of surety, question the validity of the debt secured by the deed of trust, it being binding upon her husband, the principal. *Evans v. Keeland,* 9 Ala. 46 ; *Ross v. Woodville,* 4 Mun. 324 ; *Mead v. Merrill,* 30 N. H. 474 ; *Mead v. Merrill,* 33 N. H. 437 ; *Lillard v. Puckett,* 9 J. Baxter, 568; Brandt on Suretyship, secs. 94, 201 and 359 ; *Benjamin v. Hillard,* 23 How. (U. S.) 162 ; *Brown v. Wright,* 7 T. B. Mon. 396 ; *Com. in Equity v. Ex'r Robinson,* 1 Bailey, 153 ; *Lathrop v. Masterson,* 44 Texas, 527 ; *Dillingham v. Jenkins,* 7 Smedes and M.

485. (3) Plaintiffs cannot rescind the contract on the faith of which they procured the property of defendant, and at the same time retain property acquired thereby. Pomeroy's Equity, secs. 915-917 ; *Parker v. Maguire*, 64 Mo. 41 ; *Matteson v. Holt*, 45 Vt. 336 ; Field on Damages, sec. 709 ; *Negley v. Lindsey*, 67 Pa. St. 217 ; *Hazard v. Irwin*, 18 Pick. 102. If he repudiates the contract and seeks to rescind, he must do so promptly. If he continues to treat the property as his own, he will be held to waive the objection. *Thomas v. Barton*, 48 N. Y. 200 ; *Flint v. Wood*, 9 Howe, 622 ; *Lyod v. Brewster*, 4 Paige, 537 ; *Saratoga v. R. G.*, 24 Wend. 74 ; *Mintinn v. Main*, 3 Seld. 220. If he cannot return the property he cannot rescind, but must seek his remedy at law. *Barge v. Cedar Rapids*, 32 Iowa, 101 ; *Parker v. Marquis*, 64 Mo. 38 ; *White v. Thayer*, 121 Mass. 227 ; *Barfield v. Price*, 40 Cal. 535 ; Benj. on Sales, page 386, sec. 452.

*Smith, Silver & Brown* for appellant, Salmon Falls Bank.

(1) The purchaser of a promissory note, on the statement of the maker that it is good and valid, may recover the full amount of the maker, although it is purchased at a discount. The maker is estopped from availing himself of any defense he had against the payee. *Elliott v. Callace*, 1 Penrose & Watts [Pa.] 24; *Sloan v. Richmond*, 6 Blackf. [Ind.] 175; *Honore v. Dougherty*, 4 Bibb [Ky.] 280; *Sargeant v. Sargeant*, 18 Vert. 371; *Paul v. Baugher*, 8 Ind. 501; *Vanderpool v. Brake*, 28 Ind. 130; *Tobey v. Clupman*, 13 Allen, 123; *McMullen v. Warner*, 16 S. & R. 18; *Crout v. Dewolf*, 1 R. I. 369; *Harner v. Johnson*, 1 S. & M. Ch. [Miss.] 563; *Ingham v. Vaden*, 3 Humph. [Tenn.] 51; *Preston v. Mann*, 55 Conn. 118; *Smith v. Stone*, 17 B. Monroe, 168; *Grace v. McKissock*, 49 Ala. 153. (2) And the above

principle applies where there is fraud in the execution of the notes. *Carnes v. Fields*, 2 Yeates [Pa.] 541; *Sloan v. Richmond*, 6 Blackf. [Ind.] 175; *Honore v. Dougherty*, 4 Bibb [Ky.] 280; *Simpson v. Moore*, 5 Lea [Tenn.] 372; *Sargeant v. Sargeant*, 18 Vert. 371. (3) Or even where the declaration is made under a mistake or ignorance of facts. *Sargeant v. Sargeant*, 18 Vert. 371; *Preston v. Mann*, 25 Conn. 118. (4) The maker's declaration operates as a new contract between himself and the assignee. *Elliott v. Callace*, 1 Pen. & Watts [Pa.] 24. (5) The rule has been held to apply even in the case of a forged note. *Crout v. Dewolf*, 1 R. I. 393. (6) And any act of the principal which estops him from setting up a defense personal to himself operates equally against and concludes the surety. *Whittemore v. Obear*, 58 Mo. 280; *McCabe v. Ramsey*, 32 Ind. 310; *Dillingham v. Jenkins*, 7 S. & M. 479; *Com'r v. Ex'rs*, 1 Bailey [S. C.] 151; *Lillard v. Ruckett*, 9 J. Baxter, 568; *Wilders v. Bennett*, 18 Vert. 670; *Lathrop v. Masterson*, 44 Tex. 527; *Harwood v. Kiersted*, 20 Ill. 367. (7) The defense of fraud cannot be set up by the surety on a note against a *bona fide* holder for value before maturity, and the mortgage passes as incident to and on the same footing with the note. *Hagerman v. Sutton*, 91 Mo. 521; *Goodfellow v. Stillwell*, 73 Mo. 17; *Logan v. Smith*, 58 Mo. 455; *Carpenter v. Longan*, 18 Wallace, 271; 2 Randolph Com. Paper, sec. 919. (8) It is now the settled law of this state, that the consideration of negotiable paper in the hands of a *bona fide* holder for value before maturity cannot be inquired into. *Mala fides* alone can open the door to such inquiry; gross negligence even is not sufficient; but actual knowledge of the facts which impeach the validity of the note must be brought home to the holder. *Mayes v. Robinson*, 93 Mo. 122; *Johnson v. McMurray*, 72 Mo. 278; *Edwards v. Thomas*, 66 Mo. 497; *Hamilton v. Marks*,

63 Mo. 167.   (9)   A surety will not be discharged in any case by the act of the creditor in releasing a part of the security for the debt, where the act of the creditor has worked no real injury.   And he is discharged only to the extent that he would be required if held bound. 2 Daniel on Negotiable Ins., sec. 1311; *Saline Co. v. Buie*, 65 Mo. 63; *Payne v. Bank*, 6 Smedes & M. 24; *Neff's Appeal*, 9 Watts & Serg. 36; *Ward v. Vass*, 7 Leigh. 135; *Bank v. Baker*, 4 Met. 164; *Holland v. Johnson*, 51 Ind. 346; *Kirkpatrick v. Howe*, 80 Ill. 122; Story on Prom. Notes, sec. 485.   (10)  A court of equity will not rescind a contract for fraud even as between the original parties thereto, unless it can place the parties *in statu quo*.   This the plaintiff in her bill concedes her inability to do.   *Jarrett v. Morton*, 44 Mo. 275; *Estes v. Reynolds*, 75 Mo. 565; *Hart v. Handlin*, 43 Mo. 171; Adams' Equity [5 Am. Ed.] p. 350, note; Snell's Equity [Lawson's Ed.] p. 302.   Besides on discovering the fraud, a party must elect to rescind the contract and must do so promptly, otherwise he will be held to it.   *Estes v. Reynolds, supra; Hart v. Handlin, supra; Jarrett v. Morton, supra*.   The evidence in this case shows ratification on the part of both Mr. and Mrs. Henry. (11) The supreme court will reverse the finding of the lower court when it is not supported by the evidence.   *Muenks v. Bunch*, 90 Mo. 500; *Forrester v. Scoville*, 51 Mo. 268. And will do so even in an action at law where there is failure of proof of a material averment.   *Groll v. Tower*, 85 Mo. 249.   (12)   Fraud cannot be presumed, but must be proved, and where circumstances are relied on to prove it, they must be such as to raise a strong presumption of its existence.   *Loomis v. Higgins*, 5 West Rep. 408 [Mo. Sup. Ct.]; *Funkhouser v. Lay*, 78 Mo. 458; *Henderson v. Henderson*, 55 Mo. 555.   The proof of Mr. Thompson's actual notice of the fraud, and which amounts to participation therein, is insufficient under the above cases.

*W. S. Shirk* and *E. J. Smith* for respondents.

(1) The husband, W. F. Henry, was a competent witness, because he had a marital interest in his wife's property on which the deed of trust, sought to be set aside, was given. *Steffen v. Bauer*, 70 Mo. 399, 400. (2) Mrs. Henry was a competent witness, being the substantial party in interest. *Owen v. Brockschmidt*, 54 Mo. 285; *Harriman v. Stowe*, 57 Mo. 93; *Evers v. Life Ass'n*, 59 Mo. 429. (3) In the case at bar, both husband and wife were interested, the husband by reason of his marital interest, the wife by reason of being the chief party in interest. The husband might, therefore, testify to any fact touching his own interest. If, in so doing, he testified to facts which also affected his wife's interest, his evidence was not thereby rendered incompetent. *Steffen v. Bauer*, 70 Mo. 399, 404, and authorities cited. (4) They were witnesses for each other, and their testimony was in favor of each other. There was, therefore, no error in admitting in evidence what Henry said to Mrs. Henry to induce her to sign the deed of trust, nor in admitting in evidence Mrs. Henry's testimony, as to what her husband told her. (*a*) At common law, husband and wife could not be witnesses for each other, because their interests were absolutely the same. This rule was changed by our statute. R. S. 1879, sec. 4010; *Fugate v. Pierce*, 49 Mo. 444; *Sharpe v. McPike*, 62 Mo. 300. In this case the wife did testify as to her husband's threats of desertion to induce her to sign the mortgage to secure his debt. (*b*) They could not be witnesses against each other, on the ground of public policy. *Fugate v. Pierce*, 49 Mo. 444, and authorities cited; *Bell v. Railroad*, 86 Mo. 606, and authorities cited. In this case the first ground for excluding their evidence has been swept away by section 4010, *supra*. The second never existed, because their testimony introduced in evidence was not against each other, nor did it

violate the rule with regard to confidential communications. (c) Section 4014 only debars the wife from testifying to any conversations or admissions had with or made to her by her husband. It does not debar the husband from testifying to such conversations. Henry testified that he told her all that Sneed, Stringer and Stewart had told him about the books. This, of itself, is sufficient to sustain the decree. (d) The rule as to the inviolability of communications between husband and wife was made for their protection and to preserve sacred their confidential relations. It was not made, nor intended, as a means of enabling a person to commit the most villainous frauds upon the wife through the husband, with perfect impunity, by invoking the rule in behalf of those who committed the fraud. See 1 Greenl. on Ev., secs. 254, 337 et seq.; Steffen v. Bauer, supra; Freeman v. Wilson, 51 Miss. 329; Comegy v. Clark, 44 Mo. 110; Darrier v. Darrier, 58 Mo. 222; Spurgin v. Traub, 65 Ill. 170. (5) Granting that, for some purposes, Mrs. Henry, by the execution of the deed of trust, occupies the relation of surety for him, still this principle does not estop her from showing that her execution of the mortgage was procured by fraud. She is not attempting to make any defense, whatever, for her principal, against the notes executed by her husband, nor is she questioning, in this proceeding, the validity of the debt, as against her husband. She has a right to have the mortgage declared fraudulent, if it was procured by fraud, especially if the mortgagee participated in the fraud. 1 Jones on Mortgages, sec. 113; Dennison v. Gibson, 24 Mich. 187; Hasket v. Elliott, 58 Ind. 493; Comegy v. Clark, 44 Md. 110; Central Bank v. Copeland, 18 Md. 305; Freeman v. Wilson, 51 Miss. 329; Spurgin v. Traub, 65 Ill. 170. (6) Sneed voluntarily released from the deed of trust the very property for which the notes were given, thus increasing the liability of Mrs. Henry's property therein

described, by rendering it alone liable for the payment of the debt, and this without Mrs. Henry's knowledge or consent. The Salmons Falls Bank, through its agent, Thompson, knew this fact before he took the notes. Hence Mrs. Henry's property was released as against either Sneed or the bank. 1 Jones on Mortgages, sec. 114.

SHERWOOD, J.—Robert C. Sneed, of Sedalia, owned a set of abstract books, worth, according to Morey's statement, not over two thousand dollars, for which he was willing to take four thousand dollars, and offered them to H. D. Stringer for that sum, so Stringer says; but Stringer thought of something better than that, and so suggested it to Sneed. Thereupon they laid their heads together, and, by certain covinous contrivances, so managed matters that one, Captain Wilbur F. Henry, the nominal plaintiff herein, and whose powers of deglutition seem to rival those of the great fish off the coast of Tarshish, was induced, by false *memoranda*, in the hands of Sneed, to believe that the abstract books had brought into the hands of Sneed the previous year a revenue of seven thousand dollars, and, after considerable apparent efforts on the part of Stringer, Sneed was led with much pretended reluctance, to fix a price on the books at ten thousand dollars. Stringer in the meanwhile having so manipulated Henry, and inflamed his imagination as to the great profits to be gained thereby, persuaded him to go in with him and buy the books; the terms stated to Henry being that Stringer would put in five thousand dollars, " *spot cash*," for one-half interest, and Henry, who was impecunious, and known to be so, was to raise his half of the purchase money, by giving five notes of one thousand dollars each, having several years to run, and securing the same on the real property of his wife in Sedalia, as well as on his interest in the abstract books. The books were accordingly bought at the sum mentioned, ten thousand

dollars, and Bud Shobe, who assisted in bringing about the consummation of the affair, and was the notary who took the wife's acknowledgment to the deed of trust, was the partner of Stringer in the real-estate business, and was handsomely paid for his trouble in assisting Sneed and Stringer in their machinations against Henry. When the trade was about to be closed, Stringer left town, but, on going, placed in Shobe's hands a check for five thousand dollars, on the First National Bank of Sedalia, of which Thompson, Sneed's brother-in-law, was cashier; this check was payable to Shobe's order, and he, on the trade being closed, endorsed and delivered it to Sneed, who went through the dumb show of examining the signatures, and then pronounced it *"good,"* and also said that he had been to the bank to see, etc.

Stringer had no funds in the bank, and he says in his deposition: *"That check business was arranged by me to shut the Cap.'s eyes."* Stringer was to get his half interest in the books *"for nothing,"* in consideration of his services in effecting the sale of one-half interest in the books to Henry, or he was to receive one thousand dollars at his option; and it seems he took the latter. The check was never presented to the bank, nor was it ever intended to be. Sneed knew this, and Thompson knew it. The latter at the time, and for years previously, had been financial agent of the Salmon Falls Bank, and so continued during the time covered by this litigation.

The last four of the five notes executed by Henry, and secured as aforesaid were transferred by Sneed to Thompson to negotiate; the first one of them being retained by Thompson in order to prevent its being negotiated, and Sneed still owns this note. Thompson transferred the other four notes, so he says, to the Salmon Falls Bank, and paid Sneed thirty-seven hundred dollars, as the proceeds of such transfer.

Without Mrs. Henry's knowledge or consent, Sneed, after the deed of trust was given, released Henry's half interest in the abstract books from that deed.

As soon as the one-thousand-dollar note, which first fell due, matured, Montgomery, the trustee, advertised the property for sale, and this proceeding was instituted with the purpose to perpetually enjoin and restrain the trustee and the defendant, Sneed, from selling Mrs. Henry's property under said deed; that said deed might be set aside and annulled, and all cloud cast by the same on her title be removed, etc.

The Salmon Falls Bank, as the petition recites, was "made a party hereto on its own motion, claims to be owner of said notes, and claims some rights under said deed of trust, wherefore it is made a party hereto, that its rights, if any in the premises, may be litigated and determined." The petition did not charge any fraud nor any notice thereof on the bank; but in its separate answer the latter set up the purchase of the notes before maturity for full value and without any notice of the equities alleged by plaintiffs, etc. A short time after Capt. Henry had purchased the one-half interest in the books, and had commenced to do business with them, he observed the smallness of the receipts from them; heard from friends that he had been swindled; began to suspect the honesty of the transaction, and so went around to the bank and asked Thompson if the check for five thousand dollars, given by Stringer, had ever been presented or paid, but was told by the latter that that was a *"bank secret."*

Growing more dissatisfied, Henry instituted, in his own name and behalf, a proceeding similar to the present one, which, upon representations and assurances of Sneed and Stringer that the transaction was honest, and that the check for five thousand dollars had actually been paid, he was induced to compromise, and gave a

writing, to that effect, to Sneed, which the latter, it seems, lost no time in showing to Thompson, who, thereupon, asked Henry in regard to it, when he told him that the suit had been settled and dismissed, and that he knew no good reason why he should not negotiate the notes; and the notes were thereafter negotiated by Thompson, as aforesaid.

At this time, however, Henry did not know, though he strongly suspected, that the transaction was not a fair and honest one, was not apprised, and did not have the knowledge, that the "check business" was a mere sham, contrived for the very purpose of deceiving him, and through him his wife, into securing the notes. And Thompson evidently knew that Henry did not know the true character of the check, while *he* did. Upon this state of facts, a mere outline of which has been given, and which will be more fully set forth by the reporter, the circuit court entered the following decree:

"Now, at this time, come again the parties to this action by themselves and their attorneys, and this cause having been tried and the evidence heard, as well as the argument of counsel, at the last term of this court, and said cause having been taken under advisement by the court till now, and the court, having fully considered the same, doth now find all the issues herein for the plaintiffs; and doth find that on July 18, 1883, the plaintiff, E. Josephine Henry, then and now wife of plaintiff, Wilbur F. Henry, owned in her own right, as her general property, one hundred feet off the north end of the west half of lot one (1), in block thirty-seven (37), in the original town (now city) of Sedalia, in Pettis county, Missouri, and that on said day the plaintiff, Wilbur F. Henry, executed to defendant, R. C. Sneed, his five promissory notes described in the petition, being for one thousand dollars each, and bearing seven per cent. per annum interest, and falling due in one, two, three, four and five years, respectively, from the date; that to secure said

notes the plaintiffs executed and delivered to defendant, John Montgomery, Jr., their deed of trust, which is recorded in book 32, of deeds of trust and mortgage records in said county, on page 48, conveying to him the above-described real estate, and certain abstract books, and personal property described in it, said books and personal property being the consideration of said notes, with power to sell the same on failure to pay said notes as therein provided, and the court doth find that the execution of said notes and deed of trust was procured by fraud and deceit, as stated in the petition herein, practiced on said W. F. Henry and E. Josephine Henry, and that thereafter the said Sneed, for a valuable consideration, released said books and personal property from said deed of trust, said books and personal property being the property of said Wilbur F. Henry, and that plaintiff, E. Josephine Henry, had not, at that time, or till about the commencement of this suit, any knowledge or notice of the said release of said books and property, and the court further finds that, although it appears that thereafter the defendant, Salmon Falls Bank, through its agent, J. C. Thompson, bought all of said notes except the one first falling due, and before the maturity of the same, yet said bank is not an innocent purchaser thereof, but, in fact, had, by its said agent, full knowledge and notice of said fraud, and also of said release of said books and personal property, at the time of said purchase, and said agent assisted, by concealment of facts within his knowledge, and by declining, when asked for the same by said W. F. Henry, to state to him said facts, as to the perpetration of said fraud, and the said bank thereafter, with notice of all said facts, bought said notes at a discount from their face value, and is not an innocent purchaser or entitled to the protection of the court. Wherefore, it is ordered by the court that the injunction herein be made perpetual, and that the defendants, and each of them, and all

persons acting for them, or by, through or under them, be forever restrained and enjoined from selling said above-described real estate, or any of the same, under the said deed of trust, and that said deed of trust be, and the same is, hereby fully cancelled and held for naught, and it is adjudged that plaintiffs recover of said defendant R. C. Sneed, their costs and charges herein expended, and that execution issue therefor.''

I.   We are met, at the outset of the investigation of the errors assigned, by the declaration that error was committed by the trial court in admitting the husband, as well as the wife, to testify in relation to conversations between themselves, as to the transaction concerning the abstract books.   It does not appear, in the evidence before us, whether the wife had a separate estate in the land in question, or whether she was seized of a fee in the land at common law, or whether she gained her title under the provisions of the married woman's act, or whether the husband and wife were in actual occupation of the property.

If the wife were seized under the act just mentioned, it might be very difficult to state just how much, if any, ''marital interest'' the husband would have in his wife's land, in consideration of the stringent provisions of section 3295, Revised Statutes, 1879.   Nor does it appear whether the husband was tenant by the curtesy initiate.   And, inasmuch as there is no testimony on this point, it would be unsafe to say just what the husband's interest in the case before us is.

Several things are, however, made very clear by the testimony:   *First*. That the defendants Sneed, Stringer and Shobe were engaged in a most audacious scheme of fraud.   *Second*. That the husband was used as the *conduit*, through which the *fraud-feasors* operated to induce the wife reluctantly to sign and acknowledge the deed of trust, which would have accomplished the end desired and designed by the conspirators, but for the

timely interposition of a court of equity.  The conversations then between the husband and wife, which brought about, and were intended to bring about, the result had in view, were clearly a part of the *res gestæ,* (*State v. Gabriel,* 88 Mo. 631, and cases cited), and would, therefore, seem to occupy a different attitude from the ordinary, confidential communications between husband and wife.

On one occasion, we held that a letter written by the husband to his wife, authorizing her to take the title to certain land in his name, did not fall within the rule respecting confidential communications between husband and wife, nor did the testimony of the former, touching such letter, fall within such rule.  *Darrier v. Darrier,* 58 Mo. 222, and cases cited.  But that was a contest *inter sese.*  We incline to the opinion, however, that the testimony of both husband and wife, as to the conversations referred to, was admissible on a much broader ground, and for a more elevated reason:  At common law, parties to the record were admitted as witnesses, as a marked exception to the general rule, where fraud was charged, or embezzlement, or where, on general grounds of public policy, it was deemed essential to the purposes of justice.  1 Greenl. Ev. [14 Ed.] sec. 348 and cases cited.  In the present case, Sneed attempted to take advantage of a legal technicality as to conversations between husband and wife to prevent the full extent of his fraud from being unearthed.

Now, in view of the other facts in evidence, it would be simply monstrous to permit a party to take advantage of his own wrong, and assist his own fraud by such an objection.  The rule he invokes was intended to subserve a very wise, wholesome and holy purpose, but never to further such an end as, that for which he invokes it.  And this exception to a general rule should certainly have place in a court of equity, which will throttle fraud in all of its protean manifestations.  We

shall, therefore, rule that the testimony of both husband and wife was, *ex necessitate*, competent as to their conversations, on two grounds: That those conversations were a part of the *res gestæ*, and on the foot of the fraud.

II. But it is said that the bank was an innocent purchaser of the notes; that, as such purchaser, it took the mortgage with them as an incident, possessing all the negotiable characteristics of the notes themselves, and, therefore, the bank should prevail.

"The principle is well established that if the maker or acceptor, who is primarily liable for payment of the instrument, or any party bound by the original consideration, proves that there was fraud or illegality in the inception of the instrument, or if the circumstances raise a strong suspicion of fraud or illegality, the owner must then respond by showing that he acquired it *bona fide* for value, in the usual course of business, while current, and under circumstances which create no presumption that he knew the facts which impeach its validity. This principle is obviously salutary, for the presumption is natural that an instrument so issued would be quickly transferred to another." 1 Daniel's Neg. Instr. [3 Ed.] sec. 815.

Where nothing else appears, no circumstances which would operate as constructive notice of the facts which impeach the original validity of the instrument, the holder will make out a *prima facie* case by proving that the instrument was endorsed to him for value before maturity. Having done this, his right of recovery is impregnable, unless the defendant prove that he had actual notice of facts which should have prevented a purchase by him. *Ib.*, sec. 819.

In the case at bar how has the professed holder of the notes upheld its title thereto? That the notes had their origin in a base fraud, no one can dispute. That Thompson was aware of the true nature of the whole

transaction is equally indisputable. Stringer never at any time had any funds deposited in the bank on which· the check was drawn; the check was never presented for payment or paid. Stringer had been to Thompson shortly before Henry brought his first suit, and asked him to say that the check for five thousand dollars, "*was good,*" and he refused. Henry had also been to see him endeavoring to see Stringer's bank account, and to ascertain whether the check had been paid; but could gain no information from the reticent Thompson. And the latter, as he testifies, had information additional to that already mentioned, which he had obtained from other sources; for speaking of the time when Stringer came to see him, he says: "*At that time I heard there was trouble about the trade.*"

It was not necessary, under the authorities, to fasten notice on Thompson and his principal, the bank, that he should *have had notice of the particular fraud, etc.*, in order that such principal should· be affected by it. On this point Daniel says: "Thus, if when he took the bill he were told in express terms that there was something wrong about it, without being told what the vice was, ·or if it can be collected by a jury, from circumstances fairly warranting such an inference that he knew, or believed, or thought that the bill was tainted with illegality or fraud, such a general or implicit notice will equally destroy the title." 1 Daniel's Neg. Instr., sec. 799. And while it is true there is a presumption that the transfer of the papers occurred before maturity, yet such presumption, being without any written corroborative testimony, is of the slightest nature, and open to be blown away with the slightest breath of suspicion. *Ib.*, sec. 784a.

The circumstances already related then bring this case fully within the rule in regard to commercial paper, and cast the burden on the indorsee to show such a transfer of that paper as will afford absolute protection

to the holder. No issue, it is true, was tendered by the petition as to whether the Salmon Falls Bank was a purchaser in good faith of the notes in suit, but the answer of the bank tendered such an issue in complete form, and this, under the doctrine of "express aider," supplied any lack of the petition in this respect. *Garth v. Caldwell*, 72 Mo. 622, and cas. cit.

The bank thus assumed the *affirmative* of the issue itself had made. How did it support that issue? It should certainly have done so by proof of an equally affirmative character. This it signally failed to do. Thompson does not state that the notes were transferred to the bank prior to maturity. He does not pretend to give *the date when* the transfer occurred. He says he has "a letter that will tell;" but he does not produce it. And it is only by circuitous inference and a comparison of dates that the conclusion can be reached that the notes were negotiated while current. This sort of testimony does not meet the exigencies of the rule before mentioned. The bank was challenged by its self-raised issue to give the *date when* the transfer of the notes occurred, and it should have done so in order to maintain its position of an innocent purchaser.

III. But granting that the bank, owing to the agreement and representations made as aforesaid by Henry to Thompson, was such a purchaser as to *him;* can it be so regarded as to *Mrs. Henry?* Her name does not appear to the agreement, nor does it appear that Thompson knew that she had been consulted or had assented thereto, or that she was even aware of its being made. And the deed of trust being upon record apprised Thompson, and through him the bank, of the situation of affairs; of the wife's interest in the real estate, and the relation of surety which she bore to her husband. *Bank v. Burns*, 46 N. Y. 170. Being thus apprised of Mrs. Henry's interest in the premises, and besides, aware of her interest from other sources, it

belonged to him to ascertain that the matter had been adjusted not only to Henry's satisfaction, but also to his wife's. Fair dealing demanded nothing less than this at his hands. The wife was as much a party in interest as the husband, indeed more so, because she had everything at stake.

In view of the foregoing facts, the bank cannot be regarded as an innocent purchaser as to the wife, even if it can be so regarded as to the husband; and the finding of the lower court on this latter point must, therefore, be held as supported by the evidence.

IV. But there are other and stronger reasons which conduce toward upholding the decree aforesaid. It is strenuously urged that Henry was the principal in the notes, and his wife, having mortgaged her land to secure them, was in all respects his *surety*, and that this being the case, Henry being estopped by his compromise agreement, his wife being his surety, is estopped also. It may be conceded as a general rule that the contract of the surety is accessorial to that of his principal, and that, consequently, whatever will estop the principal will estop the surety also.

But this doctrine, well established as it is, has no bearing on the present case for these reasons : Under the rule stated, the surety is indeed estopped; but why ? Because he is *sui juris* and being competent to *contract* is equally capable of being *estopped*. This *status* cannot be affirmed of a *femme covert* (7 Am. & Eng. Ency. of Law, Tit. Estoppel, p. 24), at least unless possessed of a *separate estate*, and there is not a particle of testimony on this point in the case before us. Treating Mrs. Henry then, as a *femme covert*, seized of an estate in the ordinary way, she was as incapable of being estopped by an act of her husband in which she did not join as she would be by her sole deed in which *he* did not join. Estoppels *in pais*, except as aforesaid, do not apply to married women. *Rannells v. Gerner*, 80

Mo. 474, and cases cited. An estoppel *in pais* can never operate to prejudice the rights of the person estopped, except when the sole deed of such person would have a *similar operative effect. Mueller v. Kaessman*, 84 Mo. 318, and cas. cit. No such effect would be attributed, under the rulings of this court, to the sole deed of a married woman unpossessed of a separate estate. The uniform position taken by this court on this point is abundantly sustained by authority.

There are cases, however, reported where married women are held estopped by fraud unmixed with contract; but, in such cases, their conduct must be *intentional* and *fraudulent*. Bigelow on Est. 510, *et seq.* But such a charge could not be maintained against the real plaintiff in this case, Mrs. Henry.

V. And, owing to the nature of the estate which it. will be assumed, in the absence of proof to the contrary, the wife held, the mere relation of husband and wife created no agency in the husband to bind her by his representations or create an estoppel against her even had he assumed to do so. *Wilcox v. Todd*, 64 Mo. 383; *Hall v. Callahan*, 66 Mo. 316.

VI. Again, cases are not wanting to show that the wife, whose property is bound for the notes of the husband, will not be estopped by the representations of the husband though made by him to an innocent purchaser who bought of the original payee, to the effect. that such notes were "good and valid securities, that. there was no defense to them, and that they would be paid at maturity." *Campbell v. Babcock*, 27 Wis. 512.

VII. And it has also been ruled, where a wife was a surety for her husband and others, in the purchase of the stock of a national bank, where the proceedings. were characterized by illegalities and fraud, and where the fraud was especially directed against the property of the wife, that this would authorize the wife, as such surety, to successfully invoke equitable interposition

for the protection of her property, in her behalf, notwithstanding her principals were in no position to demand a like relief, nor when they could not recede from the contract into which they had entered. *Dennison v. Gibson*, 24 Mich. 187.

As the foregoing views dispose of all questions of any practical importance in this case, and understanding the action of the circuit court to go no further than to protect the wife's interest in her land, we affirm the judgment. All concur; BARCLAY, J., in the result.