THE STATE OF KANSAS, *Appellee*, v. E. C. WILCOX et al. (HERMAN C. ERICSSON and CORY BLACK, *Appellants*).

No. 18,462.

SYLLABUS BY THE COURT.

1. CRIMINAL LIBEL—*Information—Copies of Affidavits Attached —Information Sufficient.* Where copies of affidavits which purport to have been sworn to before a notary public on a certain date are attached to an information which charges a criminal libel based thereon, the information sufficiently sets forth the manner and time of the publication.

2. ———— *Subsequent Publications—Parts of Res Gestæ—Evidence of Malice.* In a prosecution against several persons for criminal libel evidence of publications made subsequent to the one relied upon by the state, which appear to have been so connected with the main purpose as to make them parts of the *res gestæ*, are admissible as proof of malice, and where it is claimed that the several defendants conspired and confederated together for the purpose of committing the offense such evidence is admissible as tending to establish the conspiracy.

3. ———— *Communications Made in Furtherance of Conspiracy —Not Privileged.* The general rule that communications made to a prosecuting officer are privileged when made in good faith, in the prosecution of an inquiry regarding a crime which has been committed, can not be successfully invoked by the defendants in an action for criminal libel where the communications were made to the prosecuting officer in furtherance of a conspiracy to commit an indictable offense.

4. LIBEL — *Whether Privileged — Mixed Question of Fact and Law.* Under the facts stated in the opinion, the question of qualified privilege became a mixed question of fact and of law, and the court properly admitted evidence of the communications and submitted to the jury the question whether the same were privileged, admonishing them that they should wholly disregard the communications unless they found from the evidence that when the communications were made to the prosecuting officer the defendants knew them to be false and knew that no offense had been committed, but made them as part of a plan agreed upon between themselves to bring a false and baseless accusation against the libelee.

5. CONSPIRATORS—*Declarations of One—Admissible Against the*

*Others.* In this case it is held that there was no violation of the general rule ˙which requires that before the acts and declarations of one of the alleged conspirators may be proved a *prima facie* showing of a conspiracy must be offered.

Appeal from Shawnee district court, division No. 2. Opinion filed June 7, 1913. Affirmed.

*A. M. Harvey, J. E. Addington,* both of Topeka, *C. A. Crowley,* of Council Grove, and *E. C. Wilcox,* of Anthony, for the appellants.

*John S. Dawson,* attorney-general, *W. E. Atchison,* county attorney, *A. L. Noble, J. N. Tincher,* both of Medicine Lodge, *Ernest R. Simon,* and *James A. McClure,* both of Topeka, for the appellee.

The opinion of the court was delivered by

PORTER, J.: Herman C. Ericsson, Cory Black and E. C. Wilcox were jointly charged in one information with criminal libel. On the trial Wilcox was acquitted. Ericsson and Black were found guilty, and appeal.

The information in substance charged that the three defendants, together with Charlotte Thomann, H. C. Medlock and Leta Foster, conspiring and confederating together, and aiding, assisting and abetting each other, willfully and maliciously intending to villify and defame one P. B. Gillett, procured to be made public and circulated certain false and libelous affidavits charging him with misconduct with Leta Foster, a girl of less than eighteen years of age. Copies of the affidavits alleged to be libelous were attached to the information. Two of these purported to have been verified before a notary public of Shawnee county on February 10, 1912; one by Leta Foster, the other by Charlotte Thomann. Two others purported to be sworn to before the same notary February 19, 1912; one by Ericsson and one by Medlock. All the affidavits purported to refer to the conduct of the person libeled

6—90 KAN.                 +

and the said Leta Foster in a certain room in the National hotel in the city of Topeka on the morning of January 30, 1912. E. C. Wilcox has been engaged in the practice of law at Anthony for twenty-five years and was county attorney of Harper county for the two years ending in January, 1913. The person mentioned in the information as the libelee, and who is the complaining witness, has been the judge of that district for the past fifteen years. In August, 1911, disbarment proceedings were filed in the supreme court against Wilcox, which are still pending. Some of the charges against him relate to matters alleged to have occurred in his practice before the district court, and if true indicate that for some years he has not been on friendly terms with the complaining witness.

Defendant Cory Black resides at Council Grove, where he is engaged in the furniture business. He formerly lived in Harper county, and for more than twenty years has been a close, intimate friend of Wilcox. It is the theory of the prosecution that Black undertook the task of assisting his friend out of difficulties, and that in furtherance of such design he conspired with the others mentioned in the information to procure the alleged false and libelous charge to be made in order that it might be used as a "counter-irritant" in the disbarment proceedings. While the evidence does not show that the complaining witness had been active in the proceedings to disbar Wilcox, there was evidence which fairly tended to show that Wilcox either believed such to be the case, or that he thought that the judge of the court possessed an influence over others which, if brought to bear upon them, would result to his advantage in the disbarment proceedings. During the holiday season of 1911 Black, with his family, visited for a week at the home of Wilcox, returning to Council Grove the latter part of December. Defendant Ericsson is a private detective. He had recently spent some time at Anthony at

work for the state and assisting Wilcox, the county attorney, in prosecuting liquor cases. Black, immediately upon his return home, wrote to the ex-chief of police of Topeka, asking for the address of Ericsson. On the 4th or 5th of January Ericsson appeared at Council Grove; before that time he had never seen or heard of Black. After a short conference, according to his testimony, he was employed by Black at five dollars a day and expenses to look up the charges against Wilcox and to find out if there was any collusion on the part of any persons who might be prejudiced against Wilcox, and he was to look up both sides of that case. Ericsson was at Anthony four days later as a witness in a liquor case prosecuted by Wilcox. In his testimony in this case he denied that he had any conversation with Wilcox at that time about having been employed by Black, but admits that while at Anthony he secured such information as he could concerning the disbarment proceedings. Defendant Black testified that he employed Ericsson without the knowledge of Wilcox, entirely upon his own initiative, and only for the purpose of ascertaining whether the disbarment charges against his friend were true or false. To assist him in his investigation Ericsson employed H. C. Medlock, who lived in Topeka. On January 28 Medlock went to Florence and brought Leta Foster to Topeka, where she met Ericsson and received her instructions from him. It appears to have been understood that Judge Gillett would be in Topeka about that time, in attendance on the state bar association and the banquet of the Kansas Day Club. From the time of his arrival on the 28th until he left the city on January 30 he was constantly shadowed by Ericsson and Medlock. They sat near him at the banquet and followed him to the National hotel, where he was stopping. The Thomann woman and Leta Foster by prearrangement were at the Fifth Avenue hotel. Medlock registered them un-

der assumed names. Leta Foster testified that Ericsson and Medlock and Mrs. Thomann persuaded her to go to the National hotel on the morning of January 30, where a room was procured for her; that she never spoke to or with the libelee, but that he was pointed out to her by Ericsson in the lobby of the hotel; that in the evening, after she had returned to the other hotel, Ericsson brought a typewriter to the room occupied by Medlock and Mrs. Thomann and made out a paper which, at his solicitation, she signed and acknowledged the next morning before a notary public. The paper appears to have been in the form of an affidavit but was not sworn to. A similar paper was signed and acknowledged but was not sworn to. A similar paper was signed and acknowledged by Medlock. Leta Foster further testified that Ericsson promised to pay her $45 for her services and assured her that nothing would be done with the paper she had signed to hurt her in any way, and that if the person charged therein with misconduct toward her should get hold of the paper he would do nothing except "to let his lawyer friend go." Immediately after obtaining the written statements Ericsson went to Council Grove and made his first report to Black and left with him the statements. This was on February 1. Black testified:

"I told him that I wanted him to continue in my employ and secure additional information such as he could on the disbarment case and as regards these statements he had brought me; I did not know to what extent they might be of any interest. I could see no connection between them and the case for which he was employed by me, but that if he should have an opportunity to corroborate them in any way and cared to do so, he might do that. I told him I thought they were very crude and incomplete as proving the facts alleged."

He testified that on the same day he communicated with Wilcox by telephone and asked the latter to come to Council Grove; that Wilcox arrived the next day

and they discussed the character of the statements obtained by Ericsson.

"I asked him if he considered them of any particular consequence as evidence and as to whether or not in his opinion, advising me as an attorney, it would be my duty to do anything with them, laying them before the prosecuting attorney. He said he considered them very crude and of very little consequence, and that unless it should develop they were clearly and completely corroborated, it would not be wise to do anything with them, but he added further, that if the affidavits were undisputable that a crime had been committed, I, knowing these facts, should present the matter to the prosecuting officer. I also told him that Judge Gillett and I were good friends and it would give me pain to prosecute him. Mr. Wilcox especially cautioned me that they should not be exhibited to a soul unless in time they should be so thoroughly corroborated that I would feel it my duty to lay it before a county attorney. He expressed the thought that if it should become my duty to bring a prosecution of the kind I have just mentioned, in view of the fact that he and I were old friends, it might create a suspicion that I had done it with bad motives, and for that reason he especially cautioned me."

On the 10th of February Ericsson made his second report to Black and delivered to him the affidavits sworn to by the Foster girl and by Mrs. Thomann, setting forth more fully the same charges contained in the former statements. Black admits that at this time he paid Ericsson for the services performed and took from the latter the following receipt:

"COUNCIL GROVE, KANS., Feb. 10th, 1912.

"Received of C. W. Black, three hundred eighty-nine 15-100 dollars in full payment for my professional services to date in shadowing and observing the conduct of one, Judge P. B. Gillette, of Kingman, Kans., and subsequently securing documentary evidence of his conduct and circumstances corrobative thereof.

"All services rendered and documentary evidence secured and delivered by me in consideration of the above-mentioned sum are hereby vouched for as being

true and as representing the whole truth so far as in my power to determine and state, and were secured by me in a legitimate manner and entirely of my own initiative as to methods and details.

"It being understood that this evidence is to be used in the enforcement of the laws of the state of Kansas, and in furtherance of the public welfare.

H. C. ERICSSON."

On February 20, Ericsson went to Council Grove and turned over to Black an affidavit of Medlock and one of his own executed February 19, correcting some discrepancies in dates that had crept into their former affidavits, and also delivered to him a photograph of the Foster girl which he had procured to be made a few days before at Topeka.

Shortly afterwards defendant Black wrote and sent to the libelee by registered mail the following letter:

"COUNCIL GROVE, KANSAS, Feb. 29, 1912.
"*Hon. P. B. Gillett, Kingman, Kansas.*

"DEAR JUDGE—You will no doubt remember the writer as one of your old time friends and supporters. One whose occupation was traveling at the time you first run for judge, when we all put our shoulder together and beat Judge McKay. How are you, Judge, and how are things in the old 24th district. I hope 'everything is lovely and the goose hangs high.'

"A short time since I got 'next' to something that you should know. The matter has been on my mind ever since and I have pondered seriously as to my duty in the premises. It is something I would not care to tell you over the 'phone or write about in detail, nor would I want to talk about it to any one but you for fear some injustice might be done. I would not advise you to commit yourself in any way on paper, but if you feel sufficient interest come and talk with me personally and privately. It's purely personal to you and undoubtedly needs your urgent attention.

"I will say this much only, Judge, that it relates to an alleged incident at Topeka on the morning of January 30th, following the Kansas Day Banquet, and is covered by a number of very strong affidavits and some photos. I have seen part of the evidence. Seemed very strong to me and well corroborated.

The State v. Wilcox.

"I hope you may be able to show. it to be a mistake and assure you of such efforts in your behalf on my part as would be compatible with law and the public welfare, and, whatever I can do, if anything, will be entirely gratuitous and solely because of the old friendship.

"In order that this communication may reach no one but you I am registering it with special instructions not to deliver to anyone but you in person.

"If you come, write so that I may not be away.

                 Sincerely,        C. W. BLACK."

Black's testimony is that he received no reply to this letter. He denies that Wilcox knew anything about his sending the letter until May 4. He claims to have paid all the expenses incurred in the employment of Ericsson from his own funds because of his friendship for Wilcox. On May 3 he was served with a subpœna to appear before a grand jury in the United States court at Fort Scott, and immediately thereafter called Wilcox by telephone and arranged for the latter to go with him to Fort Scott as his attorney. They came to Topeka on Sunday by the same train and went to the National hotel, where they were met by Ericsson. There Wilcox by telephone summoned Mr. Simon, the county attorney of Shawnee county, to meet them. Simon came, and Wilcox, after a few minutes' conversation with him, called Black over to them and requested him to state what he knew. They exhibited to Simon the affidavits and the photograph, and urged that a prosecution be commenced against Gillett. Mr. Simon took the affidavits and agreed to investigate the matter. The defendants then resumed their journey to Fort Scott where they interviewed Mr. Bone, the district attorney, and left with him copies of the affidavits. In the meantime the Foster girl had made an affidavit denying the truth of the former affidavit and stating the circumstances under which she had been induced to sign it. On the Friday following Wilcox returned to Topeka, called upon Mr. Simon and asked for the return of the affidavits, which

the county attorney refused. The next day he called again and repeated his request, and it was likewise refused. The information in this case was filed on May 11.

The objections to the sufficiency of the information are purely technical. The court rightly overruled a motion to require the state to set forth the particular manner and time of the publication. Both facts appeared from the exhibits attached to the information showing a publication on a certain date to R. W. Eaton, the notary public. (*The State v. Dowd,* 39 Kan. 412, 18 Pac. 483.) The matters charged in the affidavits were libelous *per se.*

The principal claim of error relates to the admission of the testimony of E. R. Simon, county attorney, concerning the statements made to him by Wilcox, Black and Ericsson at the time the affidavits were delivered to him and the request was made that a prosecution against the libelee be instituted, and also the admission of evidence showing the conversation a few days later when Wilcox sought the return of the affidavits. It is insisted that these matters were privileged communications. The court properly, we think, construed the question of privilege as a mixed question of law and fact, and the whole matter is covered by the instructions, which, in substance, advised the jury that on grounds of public policy the law forbids a county attorney to testify to statements and communications made to him by third persons concerning the commission of an alleged offense or crime, and that a communication so made to him shall be kept secret and not revealed without the express consent of the person who made it; and that they should wholly disregard and dismiss from their minds the testimony of E. R. Simon respecting the communications between him and the defendants, unless the jury should find from the evidence that at the time the communications were made the defendants knew that the matters set forth in the

affidavits were untrue and that the alleged offense àt the National hotel had not been committed at all, and that the matters were presented by the defendants to the county attorney as part of a plan, scheme or agreement theretofore entered into by them to make a false and baseless accusation against the person charged therein, and as a mere pretense, and not in good faith. Upon reason and principle, without reference to authority, we have little hesitation in approving the doctrine of qualified privilege as thus declared by the trial court. It is absurd to say that a rule established by public policy for the purpose of preventing the failure of justice shall be employed to aid conspirators in concealing the evidence of the steps taken by them in furtherance of a crime as despicable as that of which the defendants were convicted. Public policy is not served by withholding communications which have not been made in good faith to the prosecuting officer, but which, on the contrary, are clearly shown to have been made as part of a vile conspiracy to blacken and defame one who is known by the authors of the communications to be wholly innocent of wrongdoing. Where the reason for the rule no longer exists, the rule fails.

The rule excluding evidence of such communications is based wholly upon grounds of public policy. There was no relation of attorney and client between the defendants and the prosecuting officer. The defendants rely upon the case of *Michael v. Matson*, 81 Kan. 360, 105 Pac. 537, but in that case the entire good faith of the communications was assumed. In *Mueller v. Radebaugh*, 79 Kan. 306, 99 Pac. 612, it was ruled that:

"A communication to an officer of the law charging a person with a crime, made in an honest effort to recover stolen property and for the purpose of detecting and punishing the criminal, is privileged." (Syl. ¶ 1.)

Even in cases of attorney and client the existence of an unlawful purpose prevents the privilege from at-

taching. (1 Taylor on Evidence, 10th ed., § 912.) The author, in the same section, stated the exception to the general rule as follows:

"If either from his (the attorney's) admission or from independent evidence it clearly appears that the communication was made by the client for a fraudulent or criminal purpose, — as, for instance, if the solicitor was questioned as to the most skillful mode of effecting a fraud, or committing an indictable offense, or apparently, even if there is a definite charge that the solicitor had been consulted for an illegal purpose, the privilege does not exist, and he is bound to disclose such guilty project."

In *Henry v. Sneed,* 99 Mo. 407, 12 S. W. 663, the question was whether conversations between husband and wife were erroneously admitted in evidence. The court, after commenting upon the fact that it was made clearly to appear that "the husband was used as a conduit, through which the fraud-feasors operated to induce the wife reluctantly to sign and acknowledge the deed of trust" (p. 420), held that the conversations were admissible as part of the *res gestæ,* and added that "in view of the other facts in evidence, it would be simply monstrous to permit a party to take advantage of his own wrong, and assist his own fraud by such an objection" (p. 421).

In *Briggs v. Garrett,* 111 Pa. St. 404, 2 Atl. 521, it was said in reference to a civil action for libel that it "is on all fours with an action for a malicious prosecution. The latter is but an aggravated form of an action for libel as in it the libel is sworn to before a magistrate. The cases make no distinction between them." (p. 414.)

In Newell on Slander and Libel, 2d ed., § 423, the author says:

"It is for the interest of the public that great freedom be allowed in complaints and accusations, however severe, if honestly made, with a view to have them inquired into, to have offenses punished, grievances redressed, and the laws carried into execution.

And this extends not merely to regular courts of justice, but to all inquiries before magistrates, referees, municipal, military and ecclesiastical bodies; and they are only restrained by this rule, viz., that they shall be made in good faith, to courts or tribunals having jurisdiction of the subject, and power to hear and decide the matter of complaint or accusation, and that they are not resorted to as a cloak for private malice."

Hageman, in his work on Privileged Communications, cites numerous cases from the English courts with respect to communications made by a client to an attorney in which it has been held that the privilege does not attach because the statements were made in furtherance of an unlawful purpose. Among the cases cited in the text is the celebrated case of *Annesley v. Lord Anglesea,* 17 Howell State Trials, 1139, in which Sergeant Tisdall lays down the rule thus:

"If the witness is employed as an attorney in any unlawful or wicked act, his duty to the public obliges him to disclose it; no private obligations can dispense with that universal one which lies on every member of the society, to discover every design which may be formed contrary to the laws of the society to destroy the public welfare." (p. 1229.)

Another authority cited is Vice-Chancellor Turner, who used this language in *Russell v. Jackson,* 9 Hare's Ch. Rep. 386:

"I am very much disposed to think that the existence of the illegal purpose would prevent any privilege attaching to the communications." (p. 391.)

"So it seems that every one, whether counsel, attorney, or other person, is bound to divulge matters communicated with a view to the perpetration of a crime." (Hageman, Privileged Communications, § 81.)

The good faith of a communication is not to be determined solely by the motives which actuate the informer. He may have malicious motives for bringing the accused to justice; may be influenced by malevolent hatred in causing the accusation to be made, provided he have reasonable grounds for the belief that a

crime has in fact been committed. But when, knowing that in fact no crime has been committed, he makes the communication in order that a prosecution shall be commenced against an innocent person, for the purpose of wreaking private vengeance, or to levy blackmail, or for any other unlawful purpose, he commits an offense against the law, and can not claim the protection which public policy has thrown around communications made in good faith for the purpose of having an honest inquiry concerning a suspected crime. The English cases holding that the publication is not privileged where defendant's object is to compromise a felony may be found in a note to 25 Cyc. 391. Manifestly the general rule has no room for application to a case like the present, where the communications were made to a prosecuting officer in furtherance of a conspiracy to commit an indictable offense. It can hardly be seriously contended that there were not sufficient facts and circumstances shown by the state to warrant the submission to the jury of the question of qualified privilege. In fact, the defendants utterly failed to bring themselves within the general rule as it is thus stated by Newell in his work on Slander and Libel, 2d ed., p. 500, § 98:

"Upon grounds of public policy communications which would otherwise be slanderous are protected as privileged if they are made in good faith in the prosecution of an inquiry, regarding a crime which has been committed and for the purpose of detecting and bringing to punishment the criminal."

The same rule was followed by this court in *Mueller v. Radebaugh*, 79 Kan. 306, 99 Pac. 612. (See, also, 25 Cyc. 391, and cases cited in note.)

Evidence of subsequent publication of the libel was admitted, and it is claimed this was error for the reason that the conspiracy, if one existed, necessarily terminated when the publication relied upon by the state was made. The contention can not be sustained.

The publication to E. R. Simon, county attorney, and to the United States district attorney, were so connected with the main purpose as to constitute them parts of the *res gestæ,* and the evidence was moreover admissible as proof of malice and to establish the fact of the conspiracy itself. The latter was necessarily shown by circumstantial evidence. By merely electing to rely upon the publication on February 10, to the notary public, the state was not precluded from offering evidence of subsequent publications made in furtherance of the original purpose.

It is argued that the conversations with the notary public before whom the affidavits were verified were privileged; but they were not made in view of any criminal proceeding contemplated. Ericsson, who procured the affidavits to be made, was a deputy sheriff; but he was acting as a private detective under Black's employment. As suggested in the briefs of the state, it is significant that he at once removed the affidavits from the county where it was alleged an offense had been committed, and delivered them to a man who had no connection whatever with the prosecution of crime in Shawnee county or elsewhere; and they were only produced by the latter when it became evident that the conspiracy had failed, and that he and Ericsson were about to be called to account for their conduct. The return of the affidavits was not sought until it became known that the Foster girl had made a disclosure of the truth and had repudiated her first affidavit.

We are not disposed to search the record for purely technical errors which it is apparent could not have worked to the prejudice of the defendants. It is extremely doubtful if any unprejudiced person, after reading the evidence, particularly that offered by the defendants themselves, could entertain a reasonable doubt of their guilt. The payment by defendant Black of such a sum of money to the private detective for the purpose expressly stated in the receipt, which he ad-

mits he prepared and had signed by the detective, and the letter written by him to the libelee, were sufficient to warrant the jury in finding him guilty as charged. The evidence of Ericsson reads almost like an admission of practically every material averment in the information.

It is urged that it was grave error to admit evidence of statements made by one defendant in the absence of the others. They were admitted upon the theory that the state would offer evidence sufficient to establish that a conspiracy as set forth in the information in fact existed. The rule upon which defendants rely with so much assurance, and which requires that before the acts and declarations of one of the alleged conspirators may be proved a *prima facie* showing of conspiracy must be made to the trial court, was not violated in this case. Conspiracies of the character in question are usually established only by circumstantial evidence. Much more evidence than we have attempted to set out in the limits of this opinion was introduced, which tended to prove the existence of the conspiracy as charged; and we have already mentioned facts proved which, in our opinion, were sufficient to render the evidence complained of admissible.

The slight discrepancies in the original affidavits and the copies thereof attached to the information were unimportant and could not have misled the defendants.

The instructions given and those refused and the objections and rulings upon the admission of testimony have all been carefully examined and no error is found.

The judgment is affirmed.