RAINIER'S DAIRIES, A CORPORATION, PLAINTIFF-APPELLANT, v. RARITAN VALLEY FARMS, INC., A CORPORATION, JOSEPH S. FRELINGHUYSEN, WALTER WEINRICH, GLADYS REED, EMILY B. FRELINGHUYSEN, EMILY L. FRELINGHUYSEN, AND HARRY M. SEALS, RARITAN VALLEY FARMS PRODUCERS ASSOCIATION, AN UNINCORPORATED ASSOCIATION, JOSEPH W. HOFFMAN, PETER P. VAN NUYS, AND VINCENT K. FLANNERY, DEFENDANTS-RESPONDENTS.

Argued September 27, 1955—Decided October 31, 1955.

554

*Mr. Robert G. Howell* argued the cause for the appellant.

*Mr. Edward W. Currie* argued the cause for the respondents.

The opinion of the court was delivered by

JACOBS, J. The plaintiff appealed to the Appellate Division from an adverse summary judgment entered in the Law Division. We certified under *R. R.* 1:10–1(*a*).

In November 1953 Joseph and Michael Gonnella, trading as Golden Dawn Dairy, filed an application with the Office of Milk Industry for permission to transfer their source of supply from the defendant Raritan Valley Farms to the plaintiff Rainier's Dairies. While that application was pending, Raritan filed a verified petition with the Director of Milk Industry in which it alleged that the Gonnellas had entered into an illegal agreement with Rainier to purchase milk from Rainier at two cents per quart below the minimum prices fixed by the Director. The defendant Raritan Valley Farms Producers Association also filed a verified petition with the Director embodying allegations similar to those contained in Raritan's petition. Both petitions prayed that the Director investigate the conduct of the Gonnellas and Rainier and

"proceed to formal hearing to revoke or condition" the licenses issued to them by the Office of Milk Industry "if such appears justified upon the proofs presented." The Gonnellas and Rainier filed answers to the petitions in which they denied the alleged illegal agreement, and interrogatories by Rainier were answered under oath by Raritan.

In accordance with departmental practice the Director, on the basis of the verified petitions which had been filed by Raritan and the Producers Association, issued a complaint and order to show cause why the licenses held by the Gonnellas and Rainier should not be revoked because of the alleged illegal agreement. A formal hearing on the order to show cause was duly held; various witnesses were called by Raritan and the Producers Association to support the allegations of the petitions and others were called by the Gonnellas and Rainier in opposition; and the witnesses were duly examined and cross-examined by counsel for the respective parties. After the close of the hearing the Director filed his formal conclusions and order. He found that the petitioners had "not established a case by a preponderance of the evidence necessary to sustain the burden of proof" and he accordingly denied their application for revocation or conditioning of the Rainier and Gonnella licenses. He pointed out, however, that the testimony had disclosed that the Gonnellas had attempted to obtain from several dealers preferential contracts which would have entailed the purchase and sale of milk below the minimum prices fixed by the Director; he accordingly denied the application by the Gonnellas for permission to transfer their source of supply from Raritan to Rainier.

Following the entry of the Director's conclusions and order the plaintiff filed its Law Division complaint seeking damages from Raritan, the Producers Association, and the various named individual defendants associated with them. The complaint contained many very vague and general allegations in eight counts and sought to set forth claims, sounding in (1) libel and (2) malicious interference with its business, and grounded upon the verified petitions filed with the Office

of Milk Industry. The complaint did not seek to set forth the recognized essential elements of an action in the nature of malicious prosecution, nor did it refer to any specific or identifiable acts by the defendants other than their participation in the filing of the verified petitions and the proceeding before the Director.

On January 17, 1955 the defendants served notice of motion to dismiss the complaint and for the entry of summary judgment on the ground that "the acts alleged to have been committed by the defendants and complained of were relevant to and a material part of a judicial proceeding and by reason thereof absolutely privileged." In support of their motion the defendants submitted affidavits which embodied most of the record of the proceeding before the Director and set forth that none of the defendants had ever conspired "to libel the plaintiff or to publish and circulate false and ill-founded statements" regarding it and that there was no publication by the defendants of the petitions except that involved in their filing with the Office of Milk Industry. No affidavits in opposition to the motion were filed by the plaintiff and the matter was duly argued before Judge Lloyd on the record thus presented to him. He expressed the view that the complaint was grounded entirely upon the proceeding before the Director; that the Director acted "as a *quasi*-judicial officer"; and that the statements which the plaintiff contended were defamatory were "absolutely privileged"; accordingly he granted the motion and the plaintiff's appeal is from the ensuing summary judgment.

The law of defamation (libel and slander) imposes broad liability for the publication of false matters which tend to injure the reputation of others. See *Prosser, Torts* 777 (1941); 3 *Restatement, Torts* §§ 558 *et seq.* (1938). It embodies the important public policy that individuals and business entities should generally be free to enjoy their reputations unimpaired by false and defamatory attacks. See *Rogers v. Courier Post Co.*, 2 N. J. 393 (1949). Occasionally, however, that policy conflicts with a counter-policy which suggests that in certain situations there is a paramount

public interest that persons be permitted to speak or write freely without being restrained by the possibility of an ensuing defamation action. In these situations the courts recognize a privilege or immunity which may be absolute or qualified; the difference is that the absolute privilege affords complete protection whereas the qualified privilege affords protection only if there is no ill motive or malice in fact. See *Andrews v. Gardiner*, 224 *N. Y.* 440, 121 *N. E.* 341, 2 *A. L. R.* 1371 (*Ct. App.* 1918); *Prosser, supra* 821 *et seq.*; *Salmond, Torts* 449 (11*th ed.* 1953); *Winfield, Torts* 333 (6*th ed.* 1954). The most noteworthy illustration of the absolute privilege or immunity is that afforded in judicial proceedings where judges, attorneys, witnesses, parties and jurors are fully protected against defamation actions based on utterances made in the course of the judicial proceedings and having some relation thereto. See *Rogers v. Thompson*, 89 *N. J. L.* 639, 640 (*E. & A.* 1916); *La Porta v. Leonard*, 88 *N. J. L.* 663, 665 (*E. & A.* 1916). See also *Veeder, Absolute Immunity in Defamation*, 9 *Col. L. Rev.* 463 (1909); *Restatement, supra* §§ 585–590; 30 *N. Y. U. L. Rev.* 171 (1955); 15 *Ohio St. L. J.* 330 (1954); 28 *St. Johns L. Rev.* 129 (1953). *Cf. Kantor v. Kessler*, 132 *N. J. L.* 336 (*E. & A.* 1945); *O'Regan v. Schermerhorn*, 25 *N. J. Misc.* 1 (*Sup. Ct.* 1946).

In the *Rogers* case, an action for slander was instituted on the basis of statements made by an attorney during a creditors' meeting before a referee in bankruptcy; the Court of Errors and Appeals held that the meeting was part of the proceedings of the court of bankruptcy and that consequently statements which had some relation thereto were absolutely privileged "even if malicious and intended to defame." In the *La Porta* case, a similar result was reached with respect to a proceeding in the recorder's court of Hoboken. In the *O'Regan* case, Judge, later Justice, Ackerson held that grand jurors were absolutely privileged against a defamation action based on a presentment or report made by them; in the course of his opinion he approved the generally prevailing doctrine that the immunity applies even in the absence of actual

authority to act so long as there was "colorable jurisdiction." See *Prosser, supra* 826, where the author notes that there are "*dicta* to the effect that the tribunal must have jurisdiction, or power to act in the situation presented; but this would compel everyone concerned to decide the question of jurisdiction at his peril, and it seems clear that the correct rule is that a mere color of jurisdiction, in fact assumed, is sufficient."

 In the instant matter there is no question that the Director had at least colorable jurisdiction to entertain and determine the proceedings initiated by Raritan and the Producers Association. See *R. S.* 4:12A–1 *et seq.* He was empowered to fix prices (*Abbotts Dairies, Inc., v. Armstrong,* 14 *N. J.* 319 (1954)), promulgate rules and regulations, and investigate alleged violations thereof. *R. S.* 4:12A–19; *R. S.* 4:12A–20. He was likewise empowered to hold informal hearings on violations (*R. S.* 4:12A–43) and to conduct formal hearings on the basis of which he might decline to issue licenses or suspend or revoke existing licenses. *R. S.* 4:12A–35. The verified petitions of Raritan and the Producers Association were duly filed with the Director and, while he might well have conducted his own investigation, he followed the established departmental practice by issuing an order to show cause and conducting an adversary proceeding between the parties in much the same fashion as strictly judicial causes are conducted. We have no doubt that the proceeding before him may readily be described as "*quasi-judicial*" within the sweep of the pertinent adjudications of this and other courts. See *Pennsylvania R. Co. v. New Jersey State Aviation Comm.,* 2 *N. J.* 64, 68 (1949); *Handlon v. Town of Belleville,* 4 *N. J.* 99, 103 (1950); cf. *Central Home Trust Co. v. Gough,* 5 *N. J. Super.* 295, 299 (*App. Div.* 1949); Wade, "*Quasi-Judicial*" *and its Background,* 10 *Camb. L. J.* 216 (1949).

Although there is some diversity of opinion, most courts recognize that the persuasive social considerations underlying the grant of absolute privilege or immunity to participants in judicial proceedings are equally applicable to *quasi*-judicial

proceedings of the nature presented in the instant matter; indeed there is much to be said for the view that their force is even greater where, as here, the proceeding was not merely designed to determine private issues between private parties but was primarily designed to ascertain whether important departmental regulations which were promulgated in the public interest were being violated. See *Parker v. Kirkland*, 298 *Ill. App.* 340, 18 *N. E.* 2d 709 (*App. Ct.* 1939); *Shummway v. Warrick*, 108 *Neb.* 652, 189 *N. W.* 301 (*Sup. Ct.* 1922); *White v. United Mills Co.*, 240 *Mo. App.* 443, 208 *S. W.* 2d 803 (*Ct. App.* 1948). *Cf. Prosser, supra* 826; *Note, Defamation—Absolute Privilege in Administrative Proceedings*, 97 *U. Pa. L. Rev.* 877 (1949); 20 *U. Chi. L. Rev.* 677, 683 (1953); 13 *Mo. L. Rev.* 320 (1948).

In the *Parker* case the court held that statements before the Board of Appeals of Cook County, during a proceeding seeking a review of a capital stock assessment, were absolutely privileged; in the course of his opinion Justice Friend noted that the proceeding before the Board was akin to a court proceeding and he approvingly quoted the rule that " 'a person is not subject to be sued for slander or libel for defamatory statements in papers filed in a judicial proceeding or before bodies whose duties are *quasi*-judicial.' " [298 *Ill. App.* 340, 18 *N. E.* 2d 714.] In the *Shummway* case the court held that a protest to the State Banking Board which was considering an application for a bank charter was absolutely privileged; the court noted that the protestant could appear before the Board, could appeal any adverse determination, and was therefore entitled to the "privileges and immunities granted a party litigant." [108 *Neb.* 652, 189 *N. W.* 303.] In the *White* case the court held that notices of separation addressed to the State Labor Commissioner of Kansas under its Unemployment Compensation Act were absolutely privileged; the court, after finding that the Commissioner was "acting in a *quasi*-judicial capacity," said:

"Although in this case there is evidence tending to show that the communication was the result of actual malice on the part of the defendant, there is no contention but that communications made,

and. testimony, in judicial proceedings are absolutely privileged under the laws of Kansas. (See *Davis v. Union State Bank*, 137 *Kan*. 264, 20 *P. 2d* 508), but plaintiff insists that, under the laws of Kansas, the rule of absolute privilege is not recognized as relating to *quasi*-judicial proceedings. If this be the law of Kansas it is contrary to the general rule. 'The rule (concerning the privilege of communications in the courts) is broad and comprehensive, including within its scope all proceedings of a judicial nature, whether pending in some court of justice or before a tribunal or officer clothed with judicial or *quasi-judicial powers. It applies to communications made before tribunals having attributes similar to those of courts.'* (53 *C. J. S., Libel and Slander*, § 104*b*.) (Italics ours.) (See, also, 33 *Am. Juris. p*. 144, and cases last cited.)

In support of his contention plaintiff cites *Marney v. Joseph*, 94 *Kan*. 18, 145 *P*. 822, *Ann. Cas.* 1917*B*, 225; *Bugg v. Northwestern Nat'l. Ins. Co*., 114 *Kan*. 549, 220 *P*. 258, and *Kirkpatrick v. Eagle Lodge, etc*., 26 *Kan*. 384, 40 *Am. Rep*. 316. In none of these cases is it held that communications made in a *quasi*-judicial proceeding are not absolutely privileged. The case of *State v. Wilcox*, 90 *Kan*. 80, 132 *P*. 982, 9 *A. L. R*. 1091 is not in point. It merely lays down the rule recognized, generally, that communications to a law enforcement officer for the purpose of helping to bring a criminal to justice are qualifiedly privileged only, not absolutely privileged. (See 22 *Am. Juris. p*. 136.) There being no Kansas authority cited holding that a matter of this kind is not absolutely privileged we apply the general or common rule as we have stated it. (*Ham v. St. Louis & S. F. R. Co*., 136 *Mo. App*. 17, 117 *S. W*. 108.)" (208 *S. W. 2d*, at *page* 806.)

Notwithstanding the foregoing, the plaintiff urges that the privilege in the instant matter should be qualified rather than absolute and it relies heavily on *Finkelstein v. Geismar*, 91 *N. J. L*. 46 (*Sup. Ct.* 1917), affirmed 92 *N. J. L*. 251 (*E. & A*. 1918) and *Licciardi v. Molnar*, 23 *N. J. Misc*. 361 (*Dist. Ct.* 1945). In the *Finkelstein* case, the court assumed that a defamatory statement made to the mayor by one merchant about another was qualifiedly privileged but sustained a verdict for the plaintiff upon a finding of actual malice. In the *Licciardi* case, the court held that a communication, from the Garfield Taxpayers' Citizens Association to the Mayor and City Council of Garfield, charging violations by members of the Board of Tax Assessors of Garfield, was qualifiedly privileged and denied recovery to the plaintiff on a finding that the defendants were not "motivated by malice."

In these cases there was no suggestion whatever that the proceedings were *quasi*-judicial in character and the holdings were consistent with many adjudications which indicate that, in general, such communications to law enforcement officials are qualifiedly privileged. See *Newell, Slander and Libel*, 445 (*4th ed.* 1924); *Prosser, supra* 839. *Cf. King v. Patterson*, 49 *N. J. L.* 417, 420 (*E. & A.* 1887); *Lawless v. Muller*, 99 *N. J. L.* 9, 12 (*Sup. Ct.* 1923); *Foltz v. Moore McCormack Lines*, 189 *F. 2d* 537 (*2d Cir.* 1951), *certiorari* denied 342 *U. S.* 871, 72 *S. Ct.* 106, 96 *L. Ed.* 655 (1951).

The thought has been advanced that since the line between these adjudications and those in which courts have recognized an absolute privilege upon a finding that the proceedings were *quasi*-judicial may sometimes be indistinct, a more realistic approach, based more frankly on the admittedly conflicting social interests, ought perhaps be formulated. It is true that in strictly judicial proceedings the potential harm which may result from the absolute privilege is somewhat mitigated by the formal requirements such as notice and hearing, the comprehensive control exercised by the trial judge whose action is reviewable on appeal, and the availability of retarding influences such as false swearing and perjury prosecutions; and the view has been expressed that it is only the potential harm as thus mitigated which may properly be considered outweighed by the public interest in favor of broad access by suitors to the courts. *Cf. Mills v. Denny*, 245 *Iowa* 584, 63 *N. W. 2d* 222, 40 *A. L. R. 2d* 933 (*Iowa Sup. Ct.* 1954); *Matthis v. Kennedy*, 67 *N. W. 2d* 413 (*Minn. Sup. Ct.* 1954). But where, as here, the administrative proceeding was actually conducted in manner and with safeguards similar to a judicial proceeding and dealt with issues of significant public concern there would, under this or any other plausible view, be no basis for refusing to invoke the doctrine of absolute privilege or immunity to the same extent that it would be applicable in court proceedings. Administrative agencies such as the Office of Milk Industry are now a vital part of American life and perform important public duties; it seems only just that, to the extent they

discharge a function comparable to the judicial function, they and the participants in the proceedings before them be vested with a comparable privilege or immunity.

In the light of the undisputed facts presented in the instant matter, we are satisfied that the lower court properly sustained the defendants' contention that the assertions in the verified petitions were absolutely privileged and could not be made the basis of an action by the plaintiff for libel. While it may be, as the plaintiff contends, that generally the defense of privilege is embodied in the answer, there is nothing to prevent defendants from moving before answer. See *R. R.* 4:58-2. Where, as here, the record on the motion shows palpably that there was no genuine issue as to any material fact challenged, and that the moving parties were entitled to judgment as a matter of law on the libel counts, summary judgment thereon for the defendants is properly entered. See *R. R.* 4:58-3; *City of Trenton v. Lenzner*, 16 *N. J.* 465, 472 (1954); *Judson v. Peoples Bank & Trust Co. of Westfield*, 17 *N. J.* 67, 75 (1954).

We come now to the counts in the plaintiff's complaint which sought to set forth a cause of action for malicious interference with its business. In the leading case of *Louis Kamm, Inc., v. Flink*, 113 *N. J. L.* 582 (*E. & A.* 1934), the Court of Errors and Appeals sustained a complaint which alleged that the defendants had maliciously interfered with the plaintiff's brokerage business by inducing the prospective seller of property to drop the plaintiff as its broker after the plaintiff had procured and confidentially disclosed the prospective purchaser. In the course of his opinion for the court, Justice Heher expressed broad principles which are now well recognized in this State as well as elsewhere—malicious interference with one's business is actionable in tort, and malice, as here used in the legal sense, simply constitutes "the intentional doing of a wrongful act without justification or excuse." See *Louis Schlesinger Co. v. Rice*, 4 *N. J.* 169, 180 (1950); *McCue v. Deppert*, 21 *N. J. Super.* 591, 595 (*App. Div.* 1952); *Longo v. Reilly*, 35 *N. J. Super.* 405, 411 (*App. Div.* 1955). *Cf. Van Horn*

564

*v. Van Horn,* 52 *N. J. L.* 284 (*Sup. Ct.* 1890), *s. c.* 53 *N. J. L.* 514 (*Sup. Ct.* 1891), *s. c.* 56 *N. J. L.* 318 (*E. & A.* 1893); *Note, Intentional Interference with Business Relations,* 3 *Rutgers L. Rev.* 277 (1949). The *Kamm* case and the many cases which reaffirmed its principles recognized the broad social policy in favor of the right to pursue one's business free from "undue interference or molestation" (113 *N. J. L.,* at *page* 586); they had no occasion to, and did not, deal with any counter-policy in favor of free access to judicial and *quasi*-judicial bodies, for the acts which there constituted the alleged undue interference or molestation were not part of a court or comparable proceeding. If the policy, which in defamation actions affords an absolute privilege or immunity to statements made in judicial and *quasi*-judicial proceedings, is really to mean anything then we must not permit its circumvention by affording an almost equally unrestricted action under a different label.

 While we are satisfied that the sweeping *Kamm* principles may not here be ′invoked, we are equally satisfied that the principles supporting an action in the nature of malicious prosecution, which by its severe restrictions gives due recognition to the counter-policy in favor of free access to judicial and *quasi*-judicial bodies, may be invoked. See *Mayflower Industries v. Thor Corp.,* 15 *N. J. Super.* 139, 150 (*Ch. Div.* 1951), affirmed 9 *N. J.* 605 (1953). Although the action for malicious prosecution began as a remedy for unjustifiable criminal proceedings, it has in many states been suitably extended to civil proceedings. See *Prosser, supra,* 885; *Note, Liability for Malicious Institution of a Civil Suit,* 1955 *Wash. U. L. Q.* 294. In our own State it was suggested long ago that a suit for the malicious prosecution of a civil action would lie if the plaintiff suffered "special grievance" (*Potts v. Imlay,* 4 *N. J. L.* 377, 382, 386 (*Sup. Ct.* 1816)), and in recent days such suit has been sustained in our courts. See *Mayflower Industries v. Thor Corp., supra.* In *Toft v. Ketchum,* 18 *N. J.* 280 (1955), we recently approved the doctrine that an action in the nature of malicious prosecution may be rested on a license revocation proceeding which

was instituted before an administrative agency and was thereafter dismissed; in this connection this court said:

"The defendant claims that the dismissal of the complaint should be upheld because an action for malicious prosecution cannot be predicated upon the institution of a proceeding before other than a judicial tribunal. We cannot agree with this general statement of law, because we incline on principle toward the weight of authority in this country, which supports the view that under certain circumstances a malicious prosecution may be predicated upon the institution of other than a judicial action, at least where such proceedings are adjudicatory in nature and may adversely affect legally protected interests. *National Surety Co. v. Page*, 58 *F.* 2d 145 (*4th Cir.* 1932) ; *Melvin v. Pence*, 76 *U. S. App. D. C.* 154, 130 *F.* 2d 423, 143 *A. L. R.* 149 (*Ct. App. D. C.*, 1942) ; *Rivers v. Dixie Broadcasting Corp.*, 88 *Ga. App.* 131, 76 *S. E.* 2d 229 (*Ct. App.* 1953) ; 3 *Restatement of Law of Torts, sec.* 680; *notes* 11 *Geo. Wash. L. Rev.* 118 (1942), 41 *Mich. L. Rev.* 549 (1942) ; 34 *Am. Jur., Malicious Prosecution, sec.* 19.1; see also *Saum v. Proudfit*, 122 *N. J. L.* 96 (*Sup. Ct.* 1939) ; *Stein v. Schmitz*, 21 *N. J. Misc.* 218 (*Sup. Ct.* 1943), affirmed 137 *N. J. L.* 725 (*E. & A.* 1948)."

Sir Percy Winfield has aptly pointed out that in its gradual development the action for malicious prosecution had to make its way between the two well known competing principles—the freedom of action that every man should have in bringing violators to justice and the necessity for checking "lying accusations of innocent people"—and that ultimately courts placed it on a firm basis by recognition of the action hedged, however, by adequate restrictions. As the concurring opinion in *Toft v. Ketchum* rightly put it (18 *N. J.*, at page 287) :

"Our law looks with some disfavor upon actions in the nature of malicious prosecution and places upon the plaintiff the responsibility of proving not only lack of probable cause but also actual malice and special injury. See *Mayflower Industries v. Thor Corp.*, 15 *N. J. Super.* 139, 151 (*Ch. Div.* 1951), affirmed 9 *N. J.* 605 (1952). But our law does not wholly prohibit such actions and the interests of justice do not suggest that it should. To the contrary, Dean Prosser, in his discussion of actions for the wrongful institution of civil proceedings, has pointed out that 'there is no policy in favor of vexatious suits known to be groundless, which are a real and often a serious injury; and the heavy burden of proof upon the plaintiff, to establish both lack of probable cause and an

improper purpose, should afford sufficient protection to the *bona fide* litigant and adequate safeguard against a series of actions.' *Prosser, Torts*, 886 (1941)."

See also *Shoemaker v. Shoemaker*, 11 *N. J. Super.* 471, 475 (*App. Div.* 1951); *Kearney v. Mallon Suburban Motors, Inc.*, 135 *N. J. L.* 457, 458 (*E. & A.* 1947).

If in the instant matter the defendants filed false accusations of misconduct by the plaintiff, without having probable cause, with actual malice, and with resulting special injury to the plaintiff, then in all justice the plaintiff should be able to maintain an action for damages in the nature of malicious prosecution; indeed the defendants have fairly conceded that much. At oral argument the plaintiff strongly urged that its complaint may now be interpreted by us as setting forth the various essential elements of a claim in the nature of malicious prosecution; we do not think so since that would really involve the rewriting of its pleading. However, we do believe that the plaintiff may justly be permitted to amend its complaint in the Law Division to that end, thereby avoiding a new proceeding; no question under the statute of limitations is presented and there never has been any adjudication whatever on the sufficiency and merits of a claim by the plaintiff in the nature of malicious prosecution. At oral argument the plaintiff also suggested that it may have a claim for malicious interference with its business based on specifically alleged acts by the defendants independent of the petitions filed with the Director; its complaint did not fairly encompass any such acts but we see no reason why the claim may not be asserted as a separate count in the amended complaint. Accordingly, the cause is:

Remanded to the Law Division for amendment of the complaint and further proceedings in accordance with the rules of practice and the principles expressed in this opinion.

WACHENFELD, J. (dissenting). I am to reverse and to remand but on broader grounds than embraced by the majority.

As stated in the majority opinion, the law of defamation imposes broad liability for the publication of false matters which tend to injure the reputation of others and it embodies the important public policy that individuals and businesses should generally be free to enjoy their reputation unimpaired by false and defamatory attacks. But the majority conclude in the instant case there was an absolute privilege and immunity.

It is true that administrative agencies are now a vital part of American life and perform important public duties, but in my opinion it is not yet part of the American way of life that one may falsely and with malice aforethought be permitted to slander and libel another and then successfully claim absolute immunity for his acts.

I would not create another forum where such practice is tolerated and the offender shielded as suggested by the majority.

My conclusion is that the privilege in the case *sub judice* is qualified rather than absolute, as defined in *Finkelstein v. Geismar*, 91 *N. J. L.* 46 (*Sup. Ct.* 1917), and I would sustain the complaint in its present form.

*For remandment*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, BURLING, JACOBS and BRENNAN—6.

*For reversal*—Justice WACHENFELD—1.