32 A.3d 217

MICHAEL C. SENISCH, PLAINTIFF–APPELLANT, v. JAMES CARLINO, LYNN MCGRATH, AND DEBORAH HEART AND LUNG CENTER, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Submitted September 26, 2011—Decided December 1, 2011.

270

272

Before Judges A.A. RODRÍGUEZ, SABATINO and ASHRAFI.

*Van Syoc Chartered,* attorneys for appellant (*D. Rebecca Higbee,* on the brief).

*Thorp Reed & Armstrong, LLP,* attorneys for respondents (*Barry R. Elson* of the Pennsylvania bar, admitted pro hac vice, and *Christopher J. Day,* on the brief).

The opinion of the court was delivered by

ASHRAFI, J.A.D.

Plaintiff Michael Senisch appeals from dismissal by summary judgment of his complaint alleging violations of the Conscientious Employee Protection Act (CEPA), *N.J.S.A.* 34:19–1 to –8, and common law defamation and tortious interference with prospective economic advantage. We affirm.

Viewed most favorably to plaintiff, *R.* 4:46–2(c); *Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995), the summary judgment record established the following relevant facts and procedural history.

Plaintiff was employed from 1995 through 2000 as a physician's assistant ("PA") in the cardiology department of defendant Deborah Heart and Lung Center ("Deborah"). During that time, he filed complaints with authorities both within and outside Deborah about conditions related to his employment. He alleged discrimination in the treatment of male PAs, and he also alleged violations of law pertaining to patient care and hospital record-keeping. Although plaintiff had received favorable performance reviews in his first years of employment at Deborah, his performance evaluation was unfavorable in 1999. A hospital committee rejected plaintiff's grievance appeal, and the negative evaluation remained in his personnel file as originally written.

Later in 1999, the Chair of the Department of Cardiology, Dr. Charles Dennis, personally evaluated plaintiff. By letters directed to plaintiff in December 1999 and January 2000, Dr. Dennis terminated his employment because of specifically stated deficiencies in his performance as a PA.

In 2001, plaintiff filed a lawsuit against Deborah alleging violations of CEPA and New Jersey's Law Against Discrimination

(LAD), *N.J.S.A.* 10:5–1 to –49. In January 2003, plaintiff and Deborah entered into a confidential settlement of that lawsuit. Plaintiff accepted payment of a sum of money and provided a release to Deborah. The settlement agreement expressly stated that it did "not constitute or reflect any violation of law or any legal obligation by any party." Also, it said nothing about modifying plaintiff's employment records.[1]

In 2004, Memorial Hospital of Salem County requested from Deborah an employment reference for plaintiff. Deborah did not answer specific questions on a questionnaire sent from Memorial Hospital; it only provided plaintiff's dates of employment and position title. Plaintiff was hired as a PA in the emergency department of Memorial Hospital. In 2006, plaintiff resigned from Memorial Hospital to work as a PA for the Delaware Department of Corrections. Apparently, Deborah was not asked to provide a reference.

Later in 2006, plaintiff learned that Dr. Dennis was leaving Deborah. He applied for an open PA position in Deborah's Cardiothoracic Surgery Department. Defendant James Carlino, Deborah's Vice President of Human Resources, responded to plaintiff by email that "it would not be beneficial ... to re-entertain [his] employment" because plaintiff "was virtually unhappy with every person [he] worked with at Deborah."

In 2007, plaintiff resigned from the Delaware Department of Corrections to work at a surgical orthopedic practice in Woodbury, New Jersey. The position required that he obtain his PA credentials at Underwood Memorial Hospital ("Underwood"). In February 2007, Underwood requested information from Deborah about plaintiff. A signed authorization stated that plaintiff "releases from liability ... all individuals and organizations who provide information to the Hospital in good faith and without malice

---

[1] Although the settlement agreement was confidential, its terms are relevant to plaintiff's current cause of action, and the parties included the agreement in the summary judgment record, which is not sealed.

concerning [his] competence, ethics, character, health status and other qualifications for Staff appointment and clinical privileges."

Defendant Dr. Lynn McGrath responded to the information request from Underwood by letter dated February 27, 2007. On the questionnaire form provided by Underwood, Dr. McGrath stated he was making "[n]o recommendation, for or against" plaintiff's application for credentials. Instead of rating plaintiff in response to specific questions from Underwood, McGrath attached a letter stating that he had not directly supervised plaintiff and that the Chairman of Cardiology at the time of plaintiff's employment was no longer at Deborah. The letter continued that "based on the composite of [plaintiff's] documented performance by his supervisors":

> Mr. Senisch worked primarily on inpatient cardiac floor services, under the direction of Attending Cardiologists. He last worked at Deborah in January 2000. As such, many of the specific questions on the attached Hospital Affiliation form cannot be directly assessed based on the documented performance record, since the privileges he is requesting at Underwood–Memorial Hospital are for orthopedic surgery service, and because I am unable to assess his current level of competence. Nonetheless, I will provide a general overview of his last documented performance assessment while at Deborah.

> On January 14, 2000, Mr. Senisch was involuntarily terminated from employment at Deborah following a series of unsuccessful attempts to achieve consistent improvement in his performance. These performance deficiencies as noted by the then Chairman of Cardiology included: an inability to consistently and reliably synthesize clinical and laboratory data into an appropriate integrated plan of care for patients under his care; an inability to consistently demonstrate appropriate clinical independence; an inability to consistently demonstrate adequate medical knowledge and judgment in Deborah's acute care setting. Mr. Senisch disagreed with the assessment of his performance, and in fairness to Mr. Senisch, I believe that some Attending staff seemed more favorably disposed towards Mr. Senisch professionally than others. Mr. Senisch is not eligible for reemployment by Deborah Heart and Lung Center.

At a meeting of Underwood's Credentialing Board, plaintiff was asked about the circumstances under which he left Deborah. Plaintiff responded that he "could not answer" because he "was under a gag clause." When plaintiff's application for credentials was not immediately approved, the office manager at the Woodbury orthopedic practice told plaintiff his employment would be terminated if he did not obtain hospital credentials. Concerned

about a negative decision, plaintiff withdrew his name from consideration for credentials and also resigned from his employment at the orthopedic practice.

Plaintiff then retained the services of a company named Documented Reference Check to pose as a prospective employer and to seek an employment reference from Deborah. No actual job opportunity was involved in the request. Dr. McGrath did not answer the inquiry from Documented Reference Check; Carlino agreed to respond if he received a release. The employment verification form sent to Carlino included a release "authorizing" Carlino and Deborah "to speak openly and honestly about [plaintiff's] quality of work." On August 6, 2007, Carlino completed the form, stating that plaintiff had been involuntarily terminated from his prior employment with Deborah and was not eligible for rehire. He also attached a letter that was substantially identical in content to McGrath's earlier letter to Underwood.

In February 2008, plaintiff filed the present lawsuit. In the first of two counts, plaintiff's complaint alleged retaliation by Deborah in violation of CEPA. *N.J.S.A.* 34:19–3, –5. In the second count, it alleged defamation and tortious interference with prospective economic advantage by McGrath and Carlino. In May 2010, defendants moved for summary judgment. The trial court granted their motion by oral decision and order, dismissing plaintiff's complaint.

On appeal, plaintiff argues that the trial court erred because the reference letters from McGrath and Carlino were defamatory and interfered with his job prospects at the Woodbury orthopedic practice and with all other future employment as a PA. He contends the letters contained false and misleading information about the circumstances of his termination from Deborah in 2000 because they failed to present his allegations of CEPA and LAD violations and to inform the inquirers that Deborah had settled the prior lawsuit brought by plaintiff.

■ We begin by rejecting plaintiff's claim based on Carlino's letter and reference of August 6, 2007. Carlino's response to the inquiry from Documented Reference Check could not have interfered with a prospective economic advantage because no such economic advantage existed. Documented Reference Check did not have employment available for plaintiff. It was only investigating his claims by posing as an employment firm.

■ Likewise, Carlino's letter could not have defamed plaintiff because Documented Reference Check was plaintiff's agent acting on his behalf. A cause of action for defamation requires proof of three elements: "(1) the assertion of a false and defamatory statement concerning another; (2) the unprivileged publication of that statement *to a third party;* and (3) fault amounting at least to negligence." *DeAngelis v. Hill,* 180 *N.J.* 1, 13, 847 *A.*2d 1261 (2004) (emphasis added). Carlino's letter was not publication of an alleged defamatory statement to a third party. A plaintiff does not have a cause of action for defamation because false and defamatory statements were made directly to the plaintiff. It is damage to the plaintiff's reputation in the eyes of others that is the basis for a cause of action for defamation. *See G.D. v. Kenny,* 205 *N.J.* 275, 293, 15 *A.*3d 300 (2011). In this case, because Documented Reference Check was acting as plaintiff's agent and not as a potential source of employment, Carlino's letter was the legal equivalent of direct communication with plaintiff. It could not damage plaintiff's reputation in the eyes of any third party. Plaintiff could only rely on McGrath's letter to support his claims, since that letter was sent directly to Underwood.

■ The summary judgment record readily permits an inference that McGrath's letter affected plaintiff's ability to obtain credentials from Underwood and his employment with the orthopedic group. *See Printing Mart–Morristown v. Sharp Elecs. Corp.,* 116 *N.J.* 739, 751–52, 563 *A.*2d 31 (1989) (elements of a cause of action for tortious interference with economic advantage). As part of his proofs, however, plaintiff was required to show that defendants interfered with his economic interest with "malice."

*Id.* at 751, 563 *A*.2d 31. "Malice" does not require proof of ill will, but it does require proof that "the harm was inflicted intentionally and without justification or excuse." *Ibid.* Defendants contend they were justified in providing a truthful reference letter, and such a reference cannot make them liable for malicious interference with plaintiff's employment prospects. Plaintiff contends that the letter was not truthful because it was incomplete and therefore misleading.

As to defamation, the threshold inquiry is whether the challenged statement is susceptible of a defamatory meaning. *See G.D., supra,* 205 *N.J.* at 293, 15 *A*.3d 300. The question of defamatory meaning is for the court to determine as a matter of law. *See Higgins v. Pascack Valley Hosp.,* 158 *N.J.* 404, 426, 730 *A*.2d 327 (1999). The court looks to "the fair and natural meaning [to be given to the statement] by reasonable persons of ordinary intelligence." *G.D., supra,* 205 *N.J.* at 293, 15 *A*.3d 300 (quoting *Romaine v. Kallinger,* 109 *N.J.* 282, 290, 537 *A*.2d 284 (1988)). Generally, a statement will be deemed defamatory if it "harms a person's reputation by lowering the community's estimation of him or by deterring others from wanting to associate or deal with him." *Ibid.* (citations omitted). Even if a statement is defamatory, however, truth is a full defense to a cause of action for defamation. *Ibid.*

In *Erickson v. Marsh & McLennan Co.,* 117 *N.J.* 539, 562–67, 569 *A*.2d 793 (1990), the Court considered a cause of action for defamation arising from a job reference. The Court held that a former employer had a qualified privilege to provide a negative reference in response to an inquiry from a prospective employer. *Id.* at 564, 569 *A*.2d 793. At common law, such a qualified privilege could be overcome only by a showing of "ill motive or malice in fact." *Id.* at 565, 569 *A*.2d 793 (quoting *Rainier's Dairies v. Raritan Valley Farms,* 19 *N.J.* 552, 558, 117 *A*.2d 889 (1955)). In subsequent development of the law, the Court "discard[ed] the label" of malice and held that "a plaintiff must establish that the publisher knew the statement to be false or

acted in reckless disregard of its truth or falsity." *Ibid.* (quoting *Dairy Stores v. Sentinel Publ'g Co.*, 104 *N.J.* 125, 151, 516 *A.*2d 220 (1986)). Proof of malice as so defined must be established by clear and convincing evidence. *Ibid.*

Thus, to prove defamation, plaintiff was required to prove by the clear and convincing standard of proof that McGrath's letter contained false statements. To prove tortious interference with prospective economic advantage, plaintiff was required to prove that defendants did not have a justification for the statements contained in McGrath's letter.

 The letter we have quoted contains factual information from plaintiff's personnel file at Deborah. Dr. McGrath reported the nature of plaintiff's employment and the contents of the performance evaluations that remained in the employer's file. Plaintiff does not and cannot allege that any statement in the letter is itself false. He argues instead that the letter is incomplete and therefore misleading because it does not explain the circumstances of his termination. Plaintiff's claim does not establish clear and convincing evidence of falsity or reckless disregard for falsity of the letter, nor does it overcome the qualified privilege of defendants to provide a truthful reference letter in response to inquiry from a prospective employer.

 The "Health Care Professional Responsibility and Reporting Enhancement Act," [2] *L.* 2005, *c.* 83 (codified at *N.J.S.A.* 26:2H–12.2a to –12.2d, with amendments to other statutory provisions), prohibits health care entities from withholding certain information about current or former employees from other health care entities that request the information. The relevant parts of the Act state:

a. A health care entity, upon the inquiry of another health care entity, shall truthfully:

. . . .

[2] The parties refer to this legislation as the "Cullen Act," after a notorious case of a nurse who had worked in several hospitals and intentionally caused the death of numerous patients.

(2) provide information about a current or former employee's job performance as it relates to patient care, as provided in this section, and, in the case of a former employee, the reason for the employee's separation.

b. For the purposes of this section, "job performance" shall relate to the suitability of the employee for re-employment at a health care entity, and the employee's skills and abilities as they relate to suitability for future employment at a health care entity. Information about a current or former employee's job performance pursuant to this paragraph shall be based on the employee's performance evaluation, and provided to another health care entity only if: (1) the evaluation has been signed by the evaluator and shared with the employee; (2) the employee has had the opportunity to respond; and (3) the employee's response, if any, has been taken into consideration when providing the information to another health care entity.

. . . .

d. A health care entity which fails to truthfully disclose information to another health care entity making an inquiry pursuant to this section or fails to cooperate with such request for information by the other health care entity shall be subject to such penalties as the Department of Health and Senior Services may determine. . . .

[*N.J.S.A.* 26:2H–12.2c.]

The Act requires disclosure of reference information as described under threat of penalty for non-compliance. It also provides immunity from civil liability if a health care entity or other person complies with its provisions:

c. A health care entity, or any employee designated by the entity, which, pursuant to this section, provides information in good faith and without malice to another health care entity concerning a health care professional, including information about a current or former employee's job performance as it relates to patient care, is not liable for civil damages in any cause of action arising out of the provision or reporting of the information.

[*N.J.S.A.* 26:2H–12.2c(c).]

Acknowledging the requirements and immunity provision of the Act, plaintiff argues that the trial court erred in concluding as a matter of law that Deborah, McGrath, and Carlino acted in good faith and without malice in providing the reference letter to Underwood. We reject plaintiff's argument and agree with the trial court that no evidence plaintiff presented in opposition to summary judgment tended to show that McGrath's letter was written in bad faith or with malice.

▆ The letter disclosed that plaintiff was involuntarily terminated and was not eligible for re-employment at Deborah, information that remained part of plaintiff's employment record after the settlement of his first lawsuit and that Deborah was required to disclose. McGrath stated he did not supervise plaintiff and was relying on his prior documented performance reviews to give a statement regarding his performance as a PA. The letter also indicated that plaintiff disagreed with his performance reviews, and that some of the attending staff were "more favorably disposed" to plaintiff than others. Defendants were not further required to describe plaintiff's version of the reason for his termination or his grievances or claims against Deborah. Such an additional obligation was particularly not warranted in this case because Deborah did not admit by the 2003 settlement agreement that it had committed any violation of law or was otherwise liable to plaintiff. In the absence of such an admission, or a judicial or administrative finding of fact to that effect, McGrath's letter did not contain false information about the circumstances of plaintiff's termination.

Because *N.J.S.A.* 26:2H–12.2c(c) and the qualified privilege under *Erickson, supra,* 117 *N.J.* at 564, 569 *A.*2d 793, protected McGrath and Deborah against civil liability for reporting the circumstances of plaintiff's termination, plaintiff could not prevail on his claims of tortious interference and defamation, or retaliation under CEPA.

Having concluded that the trial court correctly dismissed plaintiff's claims for the reasons we have stated, we need not address defendants' further argument that a claim of CEPA retaliation cannot apply to the employer's conduct after the time of employment has ended. *See Young v. Schering Corp.,* 141 *N.J.* 16, 32, 660 *A.*2d 1153 (1995) (CEPA does not apply to alleged retaliation that affects a plaintiff's employment relationship with a new employer); *Beck v. Tribert,* 312 *N.J.Super.* 335, 345, 711 *A.*2d 951 (App.Div.1998) (retaliatory negative references do not constitute "adverse employment action" under CEPA). *But cf. Roa v. Roa,*

200 *N.J.* 555, 573–74, 985 *A.*2d 1225 (2010) (a plaintiff may maintain a cause of action for reprisal under the LAD although the retaliatory conduct occurred after the time of plaintiff's employment)

Affirmed.